MILLER, Administrator, Appellant, *v.* GRANITE COUNTY POWER CO. et al., Respondents.

(No. 5,039.)

(Submitted January 29, 1923. Decided March 5, 1923.)

[213 Pac. 604.]

*Personal Injuries—Master and Servant—Workmen's Compensation Act — Casual Employment — Common-law Defenses — Available, when—Simple Tools—Assumption of Risk.*

Personal Injuries—Master and Servant—Workmen's Compensation Act— Employment Casual—Common-law Defenses Available to Employer, When.
1. An employer who elects not to come under the provisions of the Workmen's Compensation Act may, under section 2837, Revised Codes 1921, invoke the common-law defenses of contributory negligence, negligence of a fellow-servant and assumption of risk in an action

---

1. Who are employees within the meaning of the Workmen's Compensation Acts, see notes in Ann. Cas. 1913C, 28; Ann. Cas. 1916B, 793; Ann. Cas. 1918B, 704; L. R. A. 1916A, 120, 247, 365; L. R. A. 1917D, 147; L. R. A. 1918F, 179, 201, 215; 15 A. L. R. 735.

[66 Mont. 368.]

for personal injuries sustained by an employee, if the injuries were sustained while the latter was engaged in an employment of a casual nature, even though such employment was hazardous within the meaning of the Act.

Same—Casual Employment—Availability of Common-law Defenses.

2. Defendant company's business was that of generating and disposing of electric power. A watchman at its plant employed a miner to dig a well to secure water for use at the watchman's dwelling-house, and was killed while doing so. The company had elected not to come under the Workmen's Compensation Act. *Held*, that the employment of decedent was not in the usual course of business of the company but was casual in its nature and that therefore the defenses of contributory negligence and assumption of risk were available to defendant.

Same—Use of Simple Tools—Nonliability of Master.

3. The rule that a master must exercise reasonable care to provide his servant with reasonably safe working tools and to keep them in a reasonably safe condition is not absolute, but for injuries occasioned by the use of simple tools in the hands of a servant who has the same capacity and opportunity to understand their character and use as the master himself, liability does not attach to the latter.

Same—Use of Simple Tools—Assumption of Risk.

4. Where an experienced miner was employed to dig a well and was killed by a bucket used for hoisting the dirt falling upon him, its fall being caused by the hook attached to the bucket bail becoming detached in hoisting because improperly adjusted to the bail by him, the court's holding that he assumed the risk from the use of the hook, which was so simple in construction that it did not require a mechanic to understand it or the exercise of science or skill to adjust it, was correct.

*Appeal from District Court, Granite County; Geo. B. Winston, Judge.*

ACTION by John H. Miller, as administrator of the estate of Charles H. Miller, deceased, against the Granite County Power Company and another. From a judgment of nonsuit, plaintiff appeals. Affirmed.

*Mr. Wingfield L. Brown, Mr. R. Lewis Brown* and *Messrs. Maury & Melzner,* for Appellant, submitted a brief; *Mr. H. L. Maury* argued the cause orally.

*Mr. D. M. Durfee* and *Messrs. Rodgers & Rodgers,* for Respondent, submitted a brief; *Mr. H. W. Rodgers* argued the cause orally.

---

3. Liability of master for defects in common tools, see notes in 7 Ann. Cas. 342; Ann. Cas. 1912A, 1004; 40 L. R. A. (n. s.) 832; 51 L. R. A. (n. s.) 337; L. R. A. 1918D, 1141, 23 A. L. R. 716.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

Charles H. Miller received personal injuries from which he died, and the administrator of his estate instituted this action to recover damages. The defendant power company owns a hydroelectric plant near Maxville, in Granite county, for generating electric current to be sold for light and power purposes. For some time prior to this accident the plant had been closed, but about January 1, 1920, preparations were made to reopen it. Defendant Mellen was employed by the power company and resided with his family in a house owned by him but which was situated on the power company's land. Early in February, 1920, Mellen employed Miller to assist him in digging a well on the power company's land and about twenty feet from the Mellen residence. Miller was employed by the day and for the one job only. On February 16th the well had been sunk to the depth of twenty feet or more. As the work progressed, the dirt, rock and other débris were removed from the bottom of the well to the surface by means of a hand windlass, a cable and a bucket. One end of the cable was attached to the drum of the windlass and to the other end of the cable was fastened a metal hook or split link which was inserted in a loop of the bucket bail. Miller was the only person working in the well. He did the excavating and loaded the materials into the bucket. When the bucket was filled he gave a signal, and the load was hoisted by Mellen and another workman who operated the windlass. On the afternoon of February 16th a bucket was filled, the signal given and the load hoisted about ten feet from the bottom, when the bucket became detached from the hook or link and with its contents fell upon Miller, injuring him so severely that he died soon afterward.

It is charged in the complaint that Mellen was the agent, superintendent, or foreman of the power company in charge of the plant; that Miller was employed by the company; that the hook or split link furnished was inherently unsafe for

the purpose for which it was used and "was not protected with any appliance which would allow the opening in said link or hook to be closed or safely fastened after the same had been so attached to the bail of the bucket."

In its answer the power company denied that Mellen was its agent, superintendent, or foreman, and denied that he was authorized to employ anyone for it or on its behalf. It admitted that Mellen was its servant, and alleged that he was employed only as a watchman at its plant and caretaker of its property. It denied that Miller was ever in its employ, and denied all other material allegations of the complaint. It pleaded specially the defenses of contributory negligence and of assumption of risk, and alleged that Miller's employment at the time he was injured was casual in character. Defendant Mellen made substantially the same answer and in addition alleged that Miller was employed by him (Mellen) in his individual capacity and not otherwise. The affirmative allegations in each answer were put in issue by reply.

At the trial and upon the conclusion of plaintiff's evidence the court sustained a motion for nonsuit in favor of each defendant and rendered and had entered a judgment dismissing the complaint. From that judgment plaintiff appealed.

It is unnecessary to determine some of the questions pressed upon our attention. For the purposes of this appeal we assume (1) that "well digging" is a hazardous occupation within the meaning of our workmen's compensation law (Laws 1915, Chap. 96); (2) that Mellen had authority to employ a workman to perform any labor fairly within the scope of the power company's business, and to bind the company thereby; and (3) that neither the power company nor Mellen had elected to come under the compensation law.

These inquiries are presented: (1) Were the defenses of [1] contributory negligence and assumption of risk available to the defendants, and (2) did the plaintiff make out a *prima facie* case of actionable negligence? A review of the compensation laws generally discloses that in most jurisdictions some

workmen, though engaged in hazardous occupations, are not within the protection of such laws. For example, the British Workmen's Compensation Act excludes from its operation any workman "whose employment is of a casual nature and who is employed otherwise than for the purposes of the employer's trade or business." The compensation laws in force in this country are modeled after the British Act, but in matters of detail they differ from it and likewise differ from one another. Speaking generally, they fall into five groups. States belonging to the first group make no exceptions but include all workmen engaged in the hazardous employments mentioned; states of the second group exclude the workman whose employment is casual; those of the third group exclude the workman employed otherwise than in the usual course of the trade, business, profession, or occupation of the employer; states of the fourth group exclude the workman whose employment is casual *and* not in the usual course of the employer's occupation or business; and states of the fifth group exclude the workman whose employment is *either* casual or not in the usual course of the employer's business.

Section 2836, Revised Codes of 1921 (section 3 [a] of our Workmen's Compensation Act), provides: "In an action to recover damages for personal injuries sustained by an employee in the course of his employment, or for death resulting from personal injuries so sustained, it shall not be a defense: (1) That the employee was negligent, unless such negligence was willful; (2) that the injury was caused by the negligence of a fellow employee; (3) that the employee had assumed the risks inherent in, incident to, or arising out of his employment, or arising from the failure of the employer to provide and maintain a reasonably safe place to work, or reasonably safe tools or appliances."

Section 2837 declares: "The provisions of the preceding section shall not apply to actions to recover damages for personal injuries sustained by household or domestic servants,

farm or other laborers, engaged in agricultural pursuits, *or persons whose employment is of a casual nature."*

Our Compensation Act "is intended to apply to all inherently hazardous work and occupations within this state." (Sec. 2847, Rev. Codes 1921.) As applied to private employments it is elective. (Sec. 2844; *Shea* v. *North Butte Min. Co.,* 55 Mont. 522, 179 Pac. 499.) If both employer and employee come under it, its provisions for compensating the injured workman are exclusive. (Sec. 2839.) If the employer elects to come under the Act but his employee elects not to come under it, then the concluding clause of section 2838 declares that the provisions of section 2836 have no application, but the terms of section 2837 are not so restricted. They are general and indicate clearly that they include the employer engaged in a hazardous occupation but not operating under the Act as well as the householder and farmer. If the employer so engaged elects not to come under the Act, he is liable to his employee to the same extent as though the Act had never been passed, with this qualification: That his right to invoke the common-law defenses of contributory negligence, negligence of a fellow-servant and assumption of risk is modified materially. He may, however, invoke those defenses in any action against him by his employee for damages for personal injuries if the employee was injured while engaged in employment of a casual nature, even though such employment was hazardous within the meaning of the Act (sec. 2837).

Counsel for plaintiff insist that the term "casual" used in [2] section 2837 means occurring by chance or accident or without design, accidental, unexpected—citing the Standard Dictionary. However persuasive the authority might be under other circumstances, it cannot be invoked here, for the same statute defines the term and we are bound by it. Section 2888 declares: " 'Casual employment' means employment not in the usual course of trade, business, profession, or occupation of the employer." The defenses, then, are or are not available, depending upon the answer to the inquiry: Was Miller's

employment in the usual course of the business or occupation of the Granite County Power Company?

Defendant Mellen, called as a witness for the plaintiff, testified that the power company and the Royal Basin Mining Company operating in the same neighborhood were controlled by McKeever Bros. of New York; that during recent years he had taken his orders from and made his reports to them; that three or four years prior to 1920 they had one Neil in charge of their properties, and that during the time Neil was so in charge he (Mellen) had requested Neil to have a well dug on the premises, but the request was refused. He testified that before the well was dug the only available sources of water supply were Flint Creek, a spring and privately owned wells; that the waters of Flint Creek had been so polluted that they could not be used and that the spring was too far away. He testified further: "I first decided to dig the well along around the first of the year, I think; that is, of 1920. Except what I have stated as to asking Mr. Neil to dig the well, I did not ask any person or anybody else's permission to dig the well on these premises. I did not request anybody to pay for the digging of this well. I have never been engaged in the sinking of wells. That is not a part of my business now. As to whether or not the Granite County Power Company has ever been engaged in the sinking of wells, they have not that I know of. There was no part of their electrical plant that pertained to the digging of wells. When I decided to dig a well, I decided to dig it for myself. I did not decide to dig any well for the Granite County Power Company. I wanted a well dug for water for my family and the house." He testified also that McKeever Bros. did not know anything about the well being dug until after Miller's death, and that he completed it without objections from them. There is evidence to the effect that the windlass, cable and hook were taken from the Royal Basin Mining Company; that some powder used in sinking the well was purchased by Mellen and charged to the power company; that Mellen reported Miller's death to Mc-

keever Bros.; that he also took from the Royal Basin Mining Company casing and pipe for use in the well; and that after the well was completed some of the employees of the power company used water from it. It is insisted by counsel for plaintiff that a jury might have found from this evidence that Mellen was sinking the well for the power company notwithstanding his testimony that he was not doing so.

The phrase employed in our statute—"in the usual course of trade, business, profession or occupation of the employer"—or the equivalent, is found in nearly every compensation statute which excludes any workman from its provisions, and some light is reflected upon the proper meaning of that phrase by the construction given to it by courts of other jurisdictions. In *Carter* v. *Industrial Accident Commission,* 34 Cal. App. 739, 168 Pac. 1065, the facts presented were these: Carter was engaged in buying grain f. o. b. cars, the sellers (farmers) doing the loading. On account of the shortage of cars some grain was piled on the station platform, and when the cars arrived Carter employed Ladd to load them. In the course of that employment Ladd was injured. The question for determination was whether Ladd was engaged in the usual course of his employer's business. Concerning this the court said: "We may repeat that while the loading of the grain was a necessary incident to the shipping and that without said loading the shipping and sale could not be had, yet it is perfectly plain that the loading was not within the usual business of the employer. The employment must come within the normal operations of the usual and ordinary business of the employer in order to make him liable. This usual and ordinary business here did not involve the loading of the grain but embraced simply the purchase and transportation after the grain was loaded upon the cars."

In *London & Lancashire Guaranty & Accident Co.* v. *Industrial Accident Commission,* 173 Cal. 642, 161 Pac. 2, the facts were that a fire started on the Marre ranch, and G. O. Marre, in charge and representing the owners, called upon

some railway section men for assistance. They responded, and after the fire was extinguished, but before they left the ranch, one of them stepped backwards, fell, and was injured. Again the court was called upon to determine whether the injured workman was employed "in the usual course of the trade, business, profession or occupation of his employer." The court said: "Beyond all this, the employment must, under our statute, not only be in the course of the business of the employer, but in the usual course of such business. To say that the fighting of an accidental fire, which may occur only at intervals of years, is within the definition of the statute is to take all meaning and effect from the word 'usual.' The occasion calling for the employment of the applicant was accidental and unforeseen. It was not necessarily incidental to the conduct of the business. The employment was the product of an emergency, and its every characteristic marked it as the direct opposite of an employment in the usual course of the employer's business."

In *Marsh* v. *Groner*, 258 Pa. 473, L. R. A. 1918F, 213, 102 Atl. 127, these facts were presented: Mrs. Groner, a married woman, enlarged and remodeled her dwelling-house. She employed Marsh to do some plastering and he was injured while engaged in the work. Under the Pennsylvania Act, the question presented was whether Marsh received his injuries while engaged "in the regular course of the business of the employer." The court held that Mrs. Groner was not engaged in business within the meaning of the Act, and said: "There are few words more current in our speech than the word 'business'; few that include a greater variety of subjects and yet none which, in popular speech, has greater or more marked singleness in denotement. When one's business is the subject of common speech, no one can be in doubt as to the reference. It would be a very exceptional person—we do not know how to otherwise describe him—who would not understand that the reference is to the habitual or regular occupation that the party was engaged in with a view to winning a livelihood or

some gain. These objects are necessarily implied when one's business is spoken of.''

In *Callihan* v. *Montgomery,* 272 Pa. 56, 115 Atl. 889, the court again ·construed the same provision. Montgomery was operating an oil well. He employed Callihan by the hour to repair an engine used to operate a pump. It became necessary to take the cylinder of the engine to Callihan's shop, and while waiting for transportation, Callihan stepped into a pump-house, where he was caught in the machinery and killed. The court held that he was not engaged in the regular course of his employer's business at the time he was injured, reaffirmed the doctrine announced in *Marsh* v. *Groner* above, and in *Blake* v. *Wilson,* 268 Pa. 469, 15 A. L. R. 726, 112 Atl. 126, and said: ''The legislature evidently intended, by the use of the words 'regular course,' to give them some definite significance and the most natural meaning is that they refer to the normal operations which regularly constitute the business in question, excluding incidental or occasional operations arising out of the transaction of that business, such as, now and again, repairing the premises, appliances or machinery used therein. While repair work may be considered an important incident to any business using machinery, and, in some cases, may enter into the customary operations of such a business (for example, when men are engaged as regular employees for the purpose of keeping the machinery in order), yet the repairs we are here considering were no part of the regular course of the business conducted by defendant, which is producing oil; they represent merely an odd job, incidental to that business, but not part of the work ordinarily done by or under the control of the employer in this particular case.''

In *State ex rel. Lennon* v. *District Court,* 138 Minn. 103, 164 N. W. 366, the facts presented were these: Fezler operated a livery and automobile business in a small town in Minnesota. He also owned a farm near by which he rented. Fire had destroyed the barn upon the farm and it became necessary to provide temporary shelter for the tenant's livestock.

Fczler employed Lennon, a carpenter, to assist in building a shed and chicken-house, and while engaged on the latter Lennon was injured. The court there was called upon to determine whether Lennon was employed "in the usual course of the trade, business, profession, or occupation of his employer." Concerning it the court said: "It was part of defendant's business as a landlord, it is argued, to erect or repair the necessary structures on the farm, no matter what other trades or businesses he also might be engaged in.  *  *  *  Assuming that the lease obligated defendant to erect a shelter for his tenant's stock, or that he had voluntarily agreed so to do, we may say, in a certain sense, that the erection became his business or duty. But that cannot be the meaning of the word 'business' in this statute. It must have the same general significance with respect to the work or calling of the employer as the words trade, profession, or occupation, hence must refer to the employer's ordinary vocation, and not to every occasional, incidental, or insignificant work he may have to do. When we speak of a person's trade or profession we generally refer to that branch of the world's activities wherein he expends his usual everyday efforts to gain a livelihood. There is no evidence that defendant made it a part of his calling to rent out farms or erect buildings, either temporary structures or permanent. For all that appears, this was the only farm he owned, and it may have been of such small area and value that its renting and care could not properly be classified either as a business or occupation. And certainly neither the renting of the farm nor the construction of this shed can be referred to as coming within the 'usual course' of defendant's business or occupation."

In *Holbrook* v. *Olympia Hotel Co.,* 200 Mich. 597, 166 N. W. 876, the facts presented were that Holbrook was employed by the hotel company to do some painting and paper hanging and while so employed was injured. The determining question was whether his employment was "in the usual course of the trade, business, profession or occupation of his employer." The

question was answered in the negative, and the court said: "It is clear that the law contemplates that there may be an employment of labor, not in the usual course of the business of the employer, in which employment the risks of injury not occasioned by the employer's fault are assumed by the workman. It would seem that occasionally renovating the rooms of a building, or the building itself, owned and occupied by the owner as a home, with paint or paper or both, is not in the usual course of the trade, business, profession or occupation of the owner, unless he is himself in the business of painting and decorating. No reason can be found for concluding that the owner of a hotel is pursuing his business, within the meaning of the law, when he causes the rooms to be occasionally painted and decorated, although it is usual to have work of that nature done from time to time."

In *Packett* v. *Moretown Creamery Co.*, 91 Vt. 97, L. R. A. 1918F, 173, 99 Atl. 638, it appeared that the creamery company employed Flynn, a contractor, to erect a building for it. In the course of the work Packett, one of Flynn's workmen, was injured. Under the Vermont Compensation Act the fact that Flynn was an independent contractor did not relieve the creamery company if the employment was ".for the purpose of the employer's trade or business." In discussing this feature of the law the court said: "The true test is, Did the work being done pertain to the business, trade, or occupation of the creamery company, carried on by it for pecuniary gain? If so, the fact that it was being done through the medium of an independent contractor would not relieve the company from liability. The finding of the board is that the creamery company, at the time of the injury, was engaged in the creamery business. There is nothing to show that the company was engaged in the business of erecting buildings, unless such is the effect of the fact that Flynn was erecting for it a building, under a contract which made him an independent contractor and not an employee. But such is not the reasonable interpretation of employment 'for the purpose of the employer's trade

or business,' and 'in a trade or occupation  *  *  *  carried on  *  *  *  for the sake of pecuniary gain.' It would be quite as reasonable to say that Flynn was engaged in the creamery business, in contemplation of the Act, as that the creamery company was engaged in the business of erecting buildings. As well say that a farmer who lets a contract to build a barn or corncrib on his premises is engaged in the business of contractor and builder, or that the business of the contractor, while thus engaged, is that of farming.''

In *Oliphant* v. *Hawkinson,* 192 Iowa, 1259, 183 N. W. 805, the facts were these: Wachal, a retired farmer, lived in Walker, Iowa. He owned a farm which he had rented. He agreed to build a new corncrib for the tenant's use and employed Oliphant and others to do the work. While thus engaged Oliphant was injured. The question there presented was whether Oliphant's employment was ''for the purpose of the employer's trade or business,'' and concerning it the court said: ''Wachal's 'business' was not that of housebuilding. He was not carrying on any such occupation, calling, business, or pursuit for pecuniary gain. Under the very language of the statute, this employment of appellee was not 'for the purpose of the employer's trade or business.' Wachal had no trade or business, within the meaning of this Act. The fact that he owned a farm and leased it did not bring him within the class contemplated by this statute as 'an employer.' ''

In *Uphoc* v. *Industrial Board,* 271 Ill. 312, Ann. Cas. 1917D, 1, L. R. A. 1916E, 329, 111 N. E. 128, it was held that a workman building a broom-corn shed on a farm was not engaged ''in the usual course of the trade, business, profession or occupation of his employer''—a farmer. (See, also, *Maryland Casualty Co.* v. *Pillsbury,* 172 Cal. 748, 158 Pac. 1031.)

The exclusion provisions of the British Workmen's Compensation Act are more liberal towards the employee than are ours; nevertheless, under the British Act, Miller would be excluded. The British courts have held quite uniformly that the Act applies only to workmen who receive injuries in

the normal operations which form part of the ordinary business of the employer, and does not apply to workmen injured in incidental or occasional operations having for their purpose the preservation of the premises or appliances connected with the business. (*Rennie* v. *Reed*, 45 Scottish, L. R. 814, 1 B. W. C. C. 324; *Hayes* v. *Thompson & Co.*, 6 B. W. C. C. 130; *Spiers* v. *Elderslie Steamship Co.*, 46 Scottish L. R. 893, 2 B. W. C. C. 205; *Alderman* v. *Warren*, 9 B. W. C. C. 507.)

The occupation or business of the defendant power company is not left in doubt. In the complaint it is alleged that it was "engaged in generating and disposing of electric power for beneficial purposes." It is suggested by counsel for plaintiff that it was the duty of the power company to provide wholesome water for the use of its employees, hence digging the well was fairly within the usual course of the company's business; but, barring domestic service or service rendered under special contract or statute fixing a different standard of duty, we do not know of any rule of law that imposes upon an employer the duty to provide for his employees water to drink or food to eat or clothing to wear. It may be that by custom certain employers are required to provide drinking water for their employees while at work, but, if so, such a custom was neither pleaded nor proved in this instance. We are satisfied that the authorities cited above interpret correctly the provisions of our Workmen's Compensation Act defining casual employment, and, viewed in the light of that interpretation and the evidence before us, Miller was not engaged in the usual course of his employer's business or occupation, even assuming that the well was being dug for the power company. It is not contended that Mellen was an employer; on the contrary, the complaint alleges that Miller was the employee of the power company.

It is our conclusion that the defenses were available to the defendants.

The record discloses that Miller, the deceased, was an [3, 4] experienced miner. He was the only person working in the well and the only one who was in a position to see to it that the link was adjusted to the bucket bail properly at the instant the load was to be hoisted. There is not any evidence that the link was broken or out of repair, or that its condition after the accident was different in any respect from what it was before. Neither is there any evidence that it was inherently unsafe or dangerous; on the contrary, plaintiff, an experienced miner, testified that the apparatus was safe if used carefully. It is apparent that the link was as simple in construction as any device could be. It merely served the purpose of a hook to connect the cable with the bucket bail and was not intended to perform any other function. Miller had assisted in adjusting it to the particular use intended and had then used it for a week at least. Mellen, while a witness for plaintiff, testified: "I suggested absolutely nothing to Miller about the change in it. I consulted him about it. He was fixing the stuff up himself to his own convenience. As to who fixed up this link and cut it, I got the hacksaw, and we put it in the vise, and he cut it off. It was filed so the link would be admitted from the top, so this split link would fit on it here (indicating). Harry Miller did that. I did not direct him to do it. As to under whose direction it was done, he suggested that we cut it off and use this open link and use the eye in the bucket. I knew that Harry Miller was an experienced miner. I guess he had worked at mining all his life. I have known him since he was a boy. So in selecting the equipment that was used there I acted solely upon his advice. I made no suggestions myself whatever as to how the equipment should be used."

It is the general rule that the law imposes upon the master the duty to exercise reasonable care to provide his servant with reasonably safe working tools and to keep them in a reasonably safe condition. The reason for the rule is obvious. It proceeds upon the theory that the master is in a better posi-

tion than the workman to know and appreciate the danger incident to the use of a particular tool or appliance; but, whenever the reason for the rule ceases, so does the rule itself. The duty imposed by the rule is not absolute, and liability does not attach for injuries occasioned by the use of simple tools in the hands of a servant who has the same capacity and opportunity to understand their character and use as the master himself. This exception is recognized by practically all of the authorities, though there is some diversity of opinion as to the theory upon which the nonliability rests. By some courts it is held that the general rule above does not apply to simple tools and appliances. (*Vanderpool* v. *Partridge,* 79 Neb. 165, 13 L. R. A. (n. s.) 668, 112 N. W. 318; *Lynn* v. *Glucose Sugar Refining Co.,* 128 Iowa, 501, 104 N. W. 577.) Other courts merely hold the master not liable for injuries caused by the use of simple tools without indicating the ground of nonliability. (*Dunn* v. *Southern Ry. Co.,* 151 N. C. 313, 66 S. E. 134; *McMillan* v. *Minetto Shade Cloth Co.,* 134 App. Div. 28, 117 N. Y. Supp. 1081.) By others it is held that the duty of the master to make reasonable inspection has no application to simple tools. (*Longpre* v. *Big Blackfoot Milling Co.,* 38 Mont. 99, 99 Pac. 131; *Meyer* v. *Ladewig,* 130 Wis. 566, 13 L. R. A. (n. s.) 684, 110 N. W. 419.) Again other courts deny recovery upon the theory that the servant assumes the risk of danger from the use of simple tools and appliances, and this theory appears the most reasonable. It finds support in 3 Labatt's Master & Servant, page 2479, and in 4 Thompson's Commentaries on the Law of Negligence, section 4708. But upon whatever theory the rule of nonliability is grounded, the reason for it is that any defect in a simple tool or appliance is ordinarily as obvious to the workman as it is to the employer. In other words, the rule of nonliability has its foundation in the theory that the risk of using a simple tool is one of the ordinary risks of the employment. Section 7758, Revised Codes of 1921, provides: "An employer is not bound to indemnify his employee for losses suffered by the latter in

consequence of the ordinary risks of the business in which he is employed.'' An extended list of simple tools and appliances considered in adjudicated cases will be found in the notes to section 924a, Labatt's Master & Servant, and in the notes in 13 L. R. A. (n. s.) 669.

The link or hook was so simple in construction that it did not require a mechanic to understand it, and the adjustment of it to the loop in the bail of the bucket did not require the exercise of science or skill. It is perfectly obvious from this record that the accident to Miller resulted from a failure to have the hook adjusted properly at the instant the load was to be hoisted, causing the bucket to be jarred from the hook in the process of hoisting. The fact that the apparatus had been used for a week or more without injuring anyone is of itself very persuasive evidence that the hook was not inherently dangerous. The court was justified in holding that Miller assumed the risk of injury from the use of the link or hook, or, in other words, that plaintiff failed to make a case of actionable negligence.

The judgment is affirmed.

*Affirmed.*

Mr. Chief Justice Callaway and Associate Justices Cooper, Galen and Stark concur.