**J. W. (Buck) BARLOW, Appellant,**

v.

**Mrs. Josephine ANDERSON, Appellee.**

**No. 7052.**

Court of Civil Appeals of Texas.

Amarillo.

May 1, 1961.

Rehearing Denied May 29, 1961.

Martin, Moore & Tackett, Fort Worth, Henry Ray, Amarillo, for appellant.

Simpson, Adkins, Fullingim & Hankins, Culton, Morgan, Britain & White, Amarillo, for appellee.

CHAPMAN, Justice.

Appellant, J. W. (Buck) Barlow, brought action for damages against Mrs. Josephine Anderson, individually and in her capacity as independent executrix of the estate of Alec Anderson, deceased. The damages sought were alleged to have been caused when appellant, on April 8, 1959, was kicked in the jaw by a horse owned by appellee and being ridden and handled at the time by Lloyd Brigham. The rider was alleged to have been negligent in several particulars, which were proximate causes of appellant's injuries and resulting damages; that appellee was required under the law of this state to carry workmen's compensation insurance, which she did not carry; and accordingly she was deprived of the defenses of assumed risk, contributory negligence, and the fellow-servant doctrine. After hearing the evidence the trial court instructed a verdict. Appeal is perfected upon the theory that appellee as a matter of law was an "employer" within the contemplation of the workmen's compensation statutes, did not come within one of the exceptions of such statutes, and was not a subscriber. He asserts in the alternative there were disputed facts as to whether appellee was such "employer".

Under our view of the case we believe it is unnecessary for us to pass upon the question of whether Lloyd Brigham was negligent in his handling of the horse, Sunset Commander, because we believe other considerations compel our affirmance of the trial court. There is no contention that any of the acts of Brigham which might have been responsible for the injury were intentional.

Art. 8309, Vernon's Ann.Texas Civ.St., defines a number of words and phrases used in the Workmen's Compensation Act of this state. "Employee" is defined as "every person in the service of another under any contract of hire * * * *except one whose employment is not in the usual course of the trade, business, profession or occupation of his employer".[1] Thus, the question appears to be whether appellant was an "employee" within the meaning of the Workmen's Compensation Act.

A careful study of this record convinces us that the training and showing of the fancy registered horses Mrs. Anderson was paying for in the operation in which appellant was injured was simply a very expensive hobby and did not have the necessary characteristics of a *trade, business, profession or occupation* within the contemplation of the Workmen's Compensation Act. In other words, it is our belief

1. All emphasis herein is added by us unless otherwise indicated.

that appellant was not an "employee" of appellee within the contemplation of the Act because Mrs. Anderson was not engaged in a trade, business, profession or occupation within the definition of that term applicable to the act.

The record shows appellee is a fancier of registered American Saddle-Bred 5-Gaited horses; that her home and stables are located on 15th and Florida Streets in the city of Amarillo on a plot of approximately 60 acres; that at the time of appellant's injury he was training and preparing to show her horses; that Lloyd Brigham and T. J. Sneed, two colored men were helpers; and Felix Menez, a Mexican was the groom for the horses. Appellant lived in a house on the 60-acre tract 400 feet from the horse barn and had been working for Mrs. Anderson since 1956.

During all the time he worked for her he had been to no more than four shows. The testimony taken in its most favorable light concerning the prize money she could have probably won is as follows:

"Q. Now, I will ask you if in the exhibition of these horses by Mrs. Anderson, and the other owners of horses such as these, which were competing with Mrs. Anderson in these shows, if there were large cash prizes offered for the winner of these shows? A. Yes, sir.

"Q. How much were these prizes, that is for the championship, a horse found to be the champion of the show, what would be the prize money offered in the grand championship stakes? A. From $2000 to $5000.

"Q. In other words, the winner could win as much as $5000 in one class? A. No, sir, that would be the whole stakes; one could win six or seven hundred probably.

"Q. $600 or $700 in one class? A. Yes, sir."

The appellant himself, when cross-examined as to how much money he won for Mrs. Anderson in prizes at the shows, said: "Well, I don't know how much the horses would win. Showing horses is a rich person's hobby." Again he stated:

"Q. Well, Mr. Barlow, Mrs. Anderson never did any more out there than run this thing as a hobby? A. That was all. She didn't sell no horses."

■ We do not believe it is necessary to come within the Workmen's Compensation Act that the "employer" must make a profit but we do believe the profit motive is an important characteristic of an operation such as the one we are here considering in order for the operation to come within the designation of a trade, business, profession or occupation.

Though not in a Workmen's Compensation case, the Fifth Circuit Court of Appeals has distinguished between a hobby and a business in the following terms: "In the one instance the dominant motive is a realization of a profit; in the other the objective is pleasure or relaxation, and regular operation at a loss would have little effect upon continued operation." Coffey v. Commissioner of Internal Revenue, 141 F.2d 204, 205.

Our Supreme Court many years ago, in Millers' Mutual Casualty Co. v. Hoover, Tex.Com.App., 235 S.W. 863–864 recognized the industrial feature of acts such as our Workmen's Compensation Act by quoting with approval from another authority as follows:

"The general theory of the acts is that the *industry* should bear the burden of injuries to employees as it does the breakage of machinery * * *.

"They [Compensation Statutes] have apparently been passed in response to a widespread public opinion that a common-law action to recover damages for injuries suffered by employees from accidents while in the performance of

·their work *under present industrial conditions* is, in most cases, an imperfect and inadequate remedial instrumentality."

In giving the history and purpose of the Texas Workmen's Compensation Act, Professor Clark of St. Mary's University of San Antonio in Vol. 22 V.T.C.S. page XVII says:

"The basic economic theory is that of occupational risk, i. e., the risk of economic loss through personal injuries sustained in the course of operations of a *productive economy* should be borne by *industry* itself. This theory holds that loss of earning capacity through personal injury constitutes a part of the costs of production which probably should be incorporated in the price of the product," citing many cases.

The Commission of Appeals in Moore v. Lumbermen's Reciprocal Ass'n, 258 S.W. 1051–1053 says of our Texas Workmen's Compensation Act:

"It recognizes that the injury or the death imposes a financial burden—where or upon whom it does not matter—by reason of the diminished or destroyed earning power of the injured person, and undertakes to place this burden, to the extent of the award allowed, upon the business, *finally to be distributed among the members of society through their professions at prices including the average of awards in each business as a part of the costs of production.*"

The Pennsylvania act similar to ours excludes from the definition, "employee", persons whose employment is not in the regular course of the *business* of the employer. The Supreme Court of that state in Marsh v. Groner, 258 Pa. 473, 102 A. 127, 129, in holding the workman was not an employee within the contemplation of the act because the employer was not engaged in a *business* said:

"Statutes are presumed to employ words in their popular sense, and, when the words used are susceptible of more than one meaning, the popular meaning will prevail. Where the meaning involves no absurdity and is not in conflict with the other parts of the act, it is the only one that can be presumed to have been intended, and there is no room for construction. Cooley on Constitutional Limitations, pl. 68. There are few words more current in our speech than the word 'business'; few that include a greater variety of subjects and yet none which, in popular speech, have greater or more marked singleness in denotement. When one's business is the subject of common speech, no one can be in doubt as to the reference. It would be a very exceptional person—we do not know how to otherwise describe him—who would not understand that the reference is to be the habitual or regular occupation that the party was engaged in *with a view to winning a livelihood or some gain.* These objects are necessarily implied when one's business is spoken of. Eliminate them, livelihood and gain, and *it is no longer business, but amusement, which no one ever confounds with business.* What we have said as to the popular understanding of the word business is just what Webster defines it, 'Some particular occupation or employment habitually engaged in for livelihood or gain.' "

We do not see how it could be successfully contended that the record shows here Mrs. Anderson was, at the time of appellant's injury, engaged in a trade, business, profession or occupation within the meaning of those terms as used in the Workmen's Compensation Act. The record shows she was paying appellant the equivalent of approximately $485 a month, Lloyd Brigham $75 a week and T. J. Sneed $100 a week. Additionally, there was the salary of the Mexican groomsman, Felix Menez. His salary does not show in the record but if it was any where in the range of the other men working with the horses or in·the

operation of the stables the record would indicate the salaries alone for the four men totaled approximately $1,500 a month. This amount does not include the cost of feeding a dozen horses or more and the cost of transportation to the shows. In connection with the transportation the testimony shows Mrs. Anderson had a large transport with several built-in individual stalls which she used in transporting horses to the shows. The record shows the horse that did the kicking was a son of Wing Commander, six times world's champion, 5-Gaited horse of the United States. The testimony does not give us the benefit of what appellee paid for Sunset Commander as a two year old horse when she bought him in Kentucky but common reason would indicate a horse of such "blue blood" ancestry would necessarily bring a fancy price. The record shows that not a horse was sold from the stables during all the years appellant worked for appellee, and there is not any evidence of a breeding program at the stables.

We fail to see how anyone can read this record without becoming convinced that appellee's operation in connection with the horses was never intended as a trade, business, occupation or profession, was not being operated with any intention of making a profit, and was simply a very expensive hobby operated for appellee's pleasure.

Appellee in her brief has likened her operation to that of a fancier of beautiful flowers who employs three or more men as gardeners to cultivate and grow the plants for the owner's pleasure in exhibiting them at flower shows where she competes for cash prizes but never sells a flower or plant. We believe it is a close analogy and that such operation would also be similar to dog lovers who hire three or more men to train dogs that compete for cash prizes in the shows for the owner's pleasure, or who hire that number of men to train bird dogs or fox hounds for the pleasure of the owner in the sport of hunting, but who never sell any of the dogs. To hold that such operations as the one at bar and the hypothetical situations just mentioned are trades, businesses, occupations or professions within the contemplation of the Workmen's Compensation Act would do violence to the entire purpose underlining its genesis.

■ In view of what we have held we deem it unnecessary to pass upon the question of the negligence of Brigham or the contention of the parties as to whether appellant was or was not a domestic servant or farm or ranch laborer. We hold appellant was not an "employee" within the contemplation of the Workmen's Compensation Act, that appellee was not required to carry insurance under the act, and that any negligence of Brigham proximately causing appellant's injury, being that of a fellow servant, was not imputed to appellee. The judgment of the trial court is affirmed.