JUSTICE WARNER
delivered the Opinion of the Court.
¶1 Rupert M. Colmore (“Colmore”) appeals from a Judgment of the Workers’ Compensation Court concluding that the decedent, Douglas Forgey (“Forgey”) was Colmore’s employee at the time he died in a work-related accident on September 14,2000, and that Colmore, as an uninsured employer, is required to indemnify the Uninsured Employer’s Fund for death benefits paid to Forgers beneficiaries. We affirm in part and reverse in part.
¶2 We address the following issues on appeal:
¶3 1. Did the Workers’ Compensation Court err in concluding that Forgey was not a casual employee and, therefore, was entitled to Workers’ Compensation benefits?
¶4 2. Did the Workers’ Compensation Court err in determining that an error in calculation of the benefits could be corrected more than a year after benefits were determined?
I. FACTUAL AND PROCEDURAL BACKGROUND
¶5 Colmore is a long time resident of Tennessee. Colmore retired from farming in Tennessee in 1994. However, he still owned a 400 acre clear-cut parcel in Tennessee that he was in the process of re-planting in 2000. Prior to retiring, Colmore established a limited partnership named Colmore Properties, L.P. (‘Colmore Properties”), for the purpose of:
[investing in, acquiring, developing, holding, constructing, managing, operating, leasing, subleasing, owning, selling, exchanging, or otherwise dealing in land, buildings, improvements, and any interest or rights therein for agricultural uses and management of natural resources ....
Colmore, his wife Eunice and their three daughters are limited partners of Colmore Properties. Colmore Management Company, L.L.C., is the general partner of Colmore Properties. Colmore was the ‘Chief Manager” of Colmore Management Company.
¶6 Colmore Properties acquired Poison Creek Ranch near Livingston, Montana, in August of 1997. When the ranch was initially purchased, it was primarily used for recreational purposes. The ranch consists of 680 acres and a home. The property was partially fenced, but the *444 house and the fences were in a state of disrepair.
¶7 On January 1,1998, Colmore individually leased the ranch from Colmore Properties. The purpose of the lease was described as follows:
The express purpose of this lease is for agricultural purposes only, specifically the grazing and caring of cattle, horses and livestock and the planting of feed grains and other livestock supporting crops; and the exclusive use and occupancy of the house located on the Premises.
The lease required Colmore to maintain the property as follows:
[L]essee agrees to furnish all necessary material, labor, chemicals, seeds, fertilizers, and equipment to properly apply all necessary fertilizer; treat noxious weeds; maintain the land as agricultural land; plant, grow and harvest seasonal crops on the Premises; and conduct all agricultural practices reasonably related to the growth and harvest of seasonal crops on the Premises and grazing and care of cattle, horses, and livestock, all at the Lessee’s sole cost and expense. Lessee shall cultivate the Premises in a good and husbandlike manner in accordance with the best agricultural methods, and in accordance with applicable laws, including environmental laws. Lessee shall be responsible for the maintenance, care and upkeep of the property.
¶8 Colmore Properties paid for the repairs to the home to make it habitable for Colmore and his wife. The Colmores moved into the home in November 1998. They lived there during the summer and returned to Tennessee each year for the winter months. Colmore maintained a small farming operation at Poison Creek Ranch, planting less than an acre of wheat for the purpose of attracting birds to the ranch, and several acres of hay. Colmore pastured his wife’s horses at the ranch and he allowed a neighbor to pasture his horses on the ranch in exchange for looking after the ranch during the winter months. The neighbor also gave Colmore a horse and built a corral on Colmore’s property.
¶9 Colmore brought farm equipment with him from Tennessee including three tractors, a plow, a roller, a hay rake, and a grain drill, and the auger involved in Forgey’s death. Prior to the incident in question, Colmore had not sold any livestock or crops and had not filed a Montana Income Tax Return. Colmore had not opened a Montana bank account, and handled all of his financial transactions out of his Tennessee accounts.
¶10 Colmore became acquainted with Forgey in 1999 when he was working at a ranch located next to the Poison Creek Ranch. In early *445 August 2000, Forgey told Colmore that he was considering quitting his ranch job and starting his own fencing business. Forgey asked Colmore if he had any fencing work that he could do for him. Colmore said that he did not. In late August, Forgey told Colmore he had quit his job and was starting his fencing business. He asked Colmore if he could give him some work. Colmore agreed to employ Forgey for three to four weeks.
¶11 Colmore agreed to pay Forgey $12 per hour. He also agreed to reimburse him for any materials purchased. Forgey provided his own hand tools, but Colmore provided a tractor and an auger. Forgey began fencing for Colmore on August 10, 2000. Colmore told Forgey which sections of fence to work on and Forgey did the work. On September 14,2000, while working on the ranch, Forgey, who was working alone, was caught in the auger and died as a result of his injuries. Colmore found his body at the worksite. Over the four weeks that Forgey worked for Colmore he earned $1800, and was paid in cash.
¶12 On April 30,2001, Jacqueline Renee Forgey (‘Mrs. Forgey”) filed a beneficiary’s claim for compensation with the Montana Department of Labor and Industry (“Department”) requesting Workers’ Compensation benefits for herself in connection with the death of her husband. She stated in the form, that she signed and filed, that Forgey worked for Colemore for four weeks and was paid $1,800. The Department determined that an employment relationship existed between Colmore and Forgey at the time of Forgey’s death. The Department further found that Colmore was required by law to carry Workers’ Compensation Insurance for Forgey. Accordingly, the Department ordered Colmore Properties to pay Workers’ Compensation benefits to Mrs. Forgey.
¶13 As Colmore Properties failed to provide Forgey with Workers’ Compensation Insurance, the Uninsured Employer’s Fund (‘UEF”) began paying benefits to Mrs. Forgey on July 27, 2001.
¶14 Colmore Properties filed a Petition for Dispute Resolution with the Workers’ Compensation Court (‘WCC”) on October 17, 2002. On February 12, 2003, the WCC held a trial to resolve the dispute. On April 18, 2003, the WCC was advised that an additional issue concerning the appropriate wage and compensation needed to be addressed. On May 1, 2003, Mrs. Forgey filed a motion to amend the wage and compensation rate paid by the UEF, thereby requesting an increase in the average weekly wage from $300 to $443. The UEF stipulated that a calculation error was made and $443 was the proper average weekly wage. Counsel for all parties submitted the issue on an *446 agreed statement of facts and documents. The WCC directed the parties to file the agreed statement of facts and briefs for its consideration.
¶15 On March 4, 2004, the WCC entered its Findings of Fact, Conclusions of Law and Judgment, in which it concluded that Colmore, individually, was Forgey[1] s employer, and that Forgey was not a “casual employee” or ‘independent contractor.” Therefore, Colmore was required to provide Workers’ Compensation Insurance to Forgey, and Mrs. Forgey was entitled to payment based on an average wage of $443 per week. Colmore’s appeal is limited to the WCC’s findings that Forgey was not a casual employee and the amount of the benefit payment.
II. STANDARD OF REVIEW
¶16 We review findings of fact to determine if they Eire supported by substantial, credible evidence, and we review conclusions of law to determine if they are correct. Hiett v. Missoula County Pub. Sch., 2003 MT 213, ¶ 15, 317 Mont. 95, ¶ 15, 75 P.3d 341, ¶ 15. In Workers’ Compensation cases, the law in effect at the time of the claimant’s injury establishes the claimant’s substantive right to benefits. Hiett, ¶ 15.
III. DISCUSSION
ISSUE ONE
¶17 Did the Workers’ Compensation Court err in concluding that Forgey was not a casual employee and, therefore, was entitled to Workers’ Compensation benefits?
¶18 Section 39-71-401(1), MCA (1999), provides that “[e]xcept as provided in subsection (2), the Workers’ Compensation Act applies to all employers, as defined in 39-71-117, and to all employees, as defined in 39-71-118.” Colmore does not dispute on appeal that he is an employer as defined by §39-71-117, MCA (1999), and that Forgey was his employee as defined by § 39-71-118, MCA (1999). However, Colmore argues that the Workers’ Compensation Act (“Act”) is not applicable under the facts of this case because Forgey was engaged in “casual employment” as defined in §39-71-116(7), MCA, and therefore, was exempted from coverage under the Act. See § 39-71-401(2)(b), MCA (1999). Casual employment is “employment not in the usual course of the trade, business, profession, or occupation of the employer.” Section 39-71-116(7), MCA (1999). The Act does not define “course of trade, business, profession, or occupation.”
*447 ¶19 Relying on Miller v. Granite County Power Co., 66 Mont. 368, 376-77, 213 P. 604, 607 (citing Marsh v. Groner (Pa. 1917), 102 A. 127, 129) and Nelson v. Stukey (1931), 89 Mont. 277, 300 P. 287, in which this Court stated that the word ‘business” means the ‘habitual or regular occupation that a person [is] engaged in with a view to winning a livelihood or gain,” Colmore argues that he was not engaged in a ‘trade, business, profession, or occupation”because he did not lease the ranch to earn a livelihood. Accordingly, Colmore argues that Forgey’s employment on the ranch was “casual employment,” which exempted Forgey from mandated Workers’ Compensation coverage. Colmore also relies on Vogl v. Smythe (Idaho 1953), 258 P.2d 355, and Barlow v. Anderson (Tex. Civ. App. 1961), 346 S.W.2d 632, for the proposition that employment is not in the usual course of trade, business, profession or occupation when there is no profit motive involved.
¶20 Colmore argues that the WCC’s Findings of Fact support the conclusion that Colmore was not engaged in any trade, business, profession or occupation, because he had retired from farming in Tennessee in 1994; maintained minimal agricultural operations on the ranch; had not filed a Montana tax return or opened a bank account in Montana; and Colmore only lived in Montana part of the year.
¶21 Colmore further argues that the fact that he deducted the expenses associated with the ranch on his Federal Income Tax Return; signed a lease with Colmore Properties for the purpose of grazing cattle, horses and livestock, for planting grain and other livestock supporting crops; and intended to develop the ranch for agricultural purposes, provide insufficient proof that he relied on the ranch to earn a livelihood or to make a profit.
¶22 [1] As we previously have stated, ‘tt]he line of demarcation between what is and what is not employment in the usual course of trade, business, profession, or occupation of the employer is vague and shadowy.” Nelson, 89 Mont. at 286, 300 P. at 288. Therefore, such determination must be made on a case-by-case basis and a single employer may, in fact, have more than one trade or business. Nelson, 89 Mont. at 286, 300 P. at 288-89.
¶23 This Court has drawn the following distinction between improvements to property that constitute activities in the usual course of business and those which do not:
The mere owning of a house, maintaining it, and keeping it in repair and renting it, so that it may produce an income, is not sufficient to constitute a business, nor does the owning and renting of more than one house necessarily constitute a business; *448 but such transactions at most only amount to a regular business, within the meaning of the compensation act, when they are carried on to such an extent as to require a substantial and habitual devotion of time and labor to their management and operation.
Nelson, 89 Mont. at 289, 300 P. at 290 (quoting 50 A.L.R. 1177).
¶24 In Nelson, we held that a worker injured while building an addition to an apartment complex owned by a dentist was employed in the usual course of the dentist’s business. NeLson, 89 Mont. at 288, 300 P. at 289. We reached this conclusion because the dentist was also engaged in the business of being the owner and operator of a 15 unit apartment complex, and the construction work was being done in the furtherance of his existing rental business. Nelson, 89 Mont. at 288-89, 300 P. at 289-90.
¶25 Here, as in Nelson, Colmore hired Forgey to complete a task that was in furtherance of his existing business-running an agricultural operation. See Nelson, 89 Mont. at 288-89, 300 P. at 289-90. The fact that Colmore may have been engaged in other businesses, including Colmore Properties and Colmore Management Company, is inconsequential in our analysis. See Nelson, 89 Mont. at 286, 300 P. at 288-89. The fact that Forgey was only employed temporarily is also not significant. See Industrial Accident Board v. Brown Bros. Lumber Co. (1930), 88 Mont. 375, 381-82, 292 P. 902, 904 (holding that a worker injured while helping a truck driver get his lumber truck out of the mud was employed in the usual course of the lumber company’s business even though he was employed to complete a single task).
¶26 The important fact is that Forgey was employed to work for Colmore in the course of his agricultural business, and that Forgey’s only occupation at the time was to repair and replace fences for Colmore. See Carlson v. Cain (1983), 204 Mont. 311,321,664 P.2d 913, 918 (holding that the fiancé of a newspaper carrier hired to deliver papers was employed in the usual course of the newspaper’s business when she was injured in a car accident while making deliveries).
¶27 The facts in this case are distinguishable from those in Vogl and Barlow. In Vogl, the employer was not required to provide Workers’ Compensation coverage for a worker he hired to clear a road to his summer home because it was maintained separately from his business properties. Vogl, 258 P.2d at 357. Here, Colmore hired Forgey to replace and repair fencing on a working ranch that Colmore leased as a tax write-off to decrease his federal income tax on other income-producing ventures. In spite of what Colmore would have us believe, *449 the ranch was not maintained solely as a summer vacation home.
¶28 Likewise in Barlow, the employer was not required to provide Workers’ Compensation coverage for his horse trainer because there was no evidence that he kept the horses for profit -he did not breed the horses or sell them, but kept them merely as an expensive hobby. Barlow, 346 S.W.2d at 633-34. By contrast, while Colmore claims he leased the ranch as a hobby, he deducted all of the expenses of running the ranch as ‘business” expenses on his Federal Income Tax Return. Therefore, even though he did not make a profit running the ranch, he did operate the ranch with a profit motive in mind -that of reducing his overall income tax through the business expenses he incurred while operating the ranch. We agree with the Texas Court of Appeals when it said:
We do not believe it is necessary to come within the Workmen’s Compensation Act that the ‘employer’ must make a profit but we do believe the profit motive is an important characteristic of an operation such as the one we are here considering in order for the operation to come within the designation of a trade, business, profession or occupation.
Barlow, 346 S.W.2d at 634.
¶29 Colmore leased the property from his limited partnership for the express purpose of running an agricultural business. Under the terms of the lease, Colmore was obligated to furnish all of the material, labor, and equipment necessary to maintain the land as agricultural land. Colmore was also required by the terms of the lease agreement to carry business risk and liability insurance to cover any claims arising out of the agricultural operations of the ranch.
¶30 As part of the ranch operations, Colmore leased pasture land to area ranchers for grazing purposes and was responsible for maintaining the fences on the property. Colmore admitted in his deposition that he had hired at least two other people to repair and replace fences on the property in addition to the work Forgey was hired to complete. Colmore also allowed a local rancher to run horses on his property. In exchange, the horse owner built a corral on Colmore’s property and gave Colmore a horse. The rancher also fed Colmore’s horses and kept an eye on the property while Colmore was in Tennessee for the winter.
¶31 Perhaps most significantly, Colmore deducted $140,983 from his federal income taxes, in 2000, based on the agricultural deductions and depreciation claimed for both his Montana and Tennessee farming operations. Colmore claimed deductions for the rent he paid to lease *450 the ranch, depreciation on the farm equipment, and for payment of Montana taxes. Additionally, Colmore claimed deductions for expenses incurred from repairing the fences on the ranch.
¶32 [2] These facts are sufficient to support the conclusion of the WCC that Colmore operated the ranch with a profit motive, thereby qualifying Forgey’s employment for Workers’ Compensation coverage. See White v. Comm. of Internal Revenue (6th Cir. 1955), 227 F.2d 779, 779 (a profit motive is necessary to deduct ordinary and necessary business expenses on a federal income tax return).
¶33 We conclude that the WCC did not err in concluding Forgey was not a casual employee and, therefore, was entitled to Workers’ Compensation benefits.
ISSUE TWO
¶34 Did the Workers’ Compensation Court err in determining that an error in calculation of the benefits could be corrected more than a year after benefits were determined?
¶35 Section 39-71-520, MCA (1999), provides that Ta] dispute concerning uninsured employers’ fund benefits must be appealed to mediation within 90 days from the date of the determination or the determination is considered final.”
¶36 Colmore argues that the WCC erred in concluding that §39-71-520, MCA (1999), did not prohibit the UEF from correcting a calculation error and from increasing the weekly payments to Mrs. Forgey because she failed to appeal the determination of benefits within the 90 days allowed by law. We agree.
¶37 The UEF notified Mrs. Forgey by letter dated July 27, 2001, that she was entitled to death benefits based on an average weekly wage of $300. The letter included the following explanation of how the benefits were calculated:
Pursuant to Section 39-71-721(2), MCA, your Beneficiary entitlement is calculated as follows: $1,800.00 (total earnings) / 6 (total weeks worked) = $300.00 (Average Weekly Wage) $300.00 * 2/3 = $200.00 (Weekly Rate)
The letter also specifically stated:
If you do not agree with any of the determinations or calculations contained in this letter, you may request mediation. Under section 39-71-520 of the Workers’ Compensation Act if you do not appeal this decision within 90 days this determination is considered final.
This notice is not in legalese. It is easily read by a layperson. It made clear to Mrs. Forgey, and anyone else who bothered to read it, that it *451 is calculated on six weeks of earnings. Further, it makes it clear that it is a final determination if not contested in 90 days. When Mrs. Forgey filed the First Report of Injury with the Department of Labor on April 30,2001, she clearly indicated that her husband earned $450 per week. Therefore, it is not unreasonable to expect that Mrs. Forgey should have recognized that the UEF made an error in calculating For gey’s average weekly wage by dividing $1800 by 6, instead of 4 weeks. Both Mrs. Forgey and Colmore had 90 days to appeal the decision to the UEF. Colmore appealed the decision on the grounds that Forgey was an independent contractor, or in the alternative, was a casual employee, and therefore, was not entitled to benefits. Colmore’s appeal was mediated on September 6, 2001, in accordance with the procedures set forth in §39-71-520, MCA (1999). When the attempt at mediation failed, Colmore filed a petition for dispute resolution with the WCC.
¶38 Mrs. Forgey argues that because Colmore appealed the UEF’s decision to grant benefits within the 90 days provided by statute, that she was relieved from her statutory duty to cross-appeal the calculation of Forgey’s average weekly wage. She further argues that she could not have appealed within 90 days because she did not become aware of the mistake in calculation until much later.
¶39 This Court has long held that the time limits for filing an appeal are mandatory and jurisdictional. Joseph Eve & Co. v. Allen (1997), 284 Mont. 511, 514, 945 P.2d 897, 899. Therefore, an appellant has a duty to perfect its appeal in the maimer provided by statute. Joseph, 284 Mont. at 514, 945 P.2d at 899. Absent such compliance, this Court lacks jurisdiction to hear the appeal. Joseph, 284 Mont. at 514, 945 P.2d at 899. In a similar fashion, this Court has held that failure to properly file a cross-appeal precludes this Court from addressing the issues raised in the cross-appeal. Joseph, 284 Mont. at 514, 945 P.2d at 899. A cross-appeal is necessary where the respondent seeks review of matters “separate and distinct” from those sought to be reviewed by the appellant. Joseph, 284 Mont. at 514, 945 P.2d at 899 (citing Johnson v. Tindall (1981), 195 Mont. 165, 170, 635 P.2d 266, 268).
¶40 More than two parties are involved in this case. UEF and Mrs. Forgey may agree to ignore the time requirement of §39-71-520, MCA (1999). However, they and the dissent ignore the rights of Colemore, the one who would be required to make the increased payment if this Court were to affirm the order of the WCC. Colemore made no stipulation to increase the average weekly wage calculation some 17 months after it became final by law. He had the right to rely on the *452 amount fixed in considering his position in this litigation and in going about his business. The question of whether UEF is responsible to Mrs. Forgey is not before us. As far as Colemore is concerned, Mrs. Forgey had a statutory duty to follow the same procedure as Colmore because the issue she raised regarding the proper amount of benefits was separate and distinct from the issue raised by Colmore as to whether benefits should have been provided in the first place. She failed to appeal the issue to the UEF. Had she done so, and had the issue not been resolved through mediation, she too could have filed a petition with the WCC to resolve the dispute. It was not until sometime during discovery in the underlying case that her attorney noticed what he believed was the error. On May 1, 2003, he filed a motion with the WCC requesting that the court order the error corrected, even though the determination of benefits became final at the end of October 2001 and had not been properly appealed to the UEF.
¶41 The WCC considered the motion to amend during trial in spite of the fact that the issue was not properly before the court, as mediation is a prerequisite to filing a petition in the WCC, and a failure to request mediation bars the court from reviewing UEF determinations. Sections 39-71-2401(1), 2408(1), and 2905(1), MCA (1999). In increasing the benefit amount, the WCC erroneously relied on South v. Transportation Ins. Co. (1996), 275 Mont. 397, 401, 913 P.2d 233, 235, in which this Court concluded that full and fair settlement agreements are contracts and may be rescinded if parties were laboring under mutual mistake regarding material fact, at the contracts inception, which impacted the agreement to such a degree that the contract may be rescinded. However, there was no settlement contract in this case. Section 39-71-520, MCA (1999), places a limitation on the time within which a claimant may dispute a determination of benefits regardless of the merits of her position.
¶42 The notice sent to Mrs. Forgey was designed to tell her, without the necessity of hiring a lawyer, the average weekly wage upon which her benefits would be calculated. UEF advised her of this fact and also how her benefits would be calculated, in plain English. She may not have examined the notice, and may not have realized that UEF had made a mistake. UEF presumably did not realize it miscalculated the average weekly wage. However, a statute of limitations for actions based on a mistake does not depend on actual discovery of the alleged mistake before it begins to run. D’Agostino v. Swanson (1989), 240 Mont. 435, 443, 784 P.2d 919, 924. Rather, the limitations period begins to run when the facts are such that the party *453 seeking relief would have discovered the mistake had he exercised ordinary diligence. D’Agostino, 240 Mont. at 443, 784 P.2d at 924; Gregory v. City of Forsyth (1980), 187 Mont. 132, 136, 609 P.2d 248, 251. In the exercise of ordinary diligence UEF should have realized that it miscalculated the average weekly wage, as should have Mrs. Forgey. Absent grounds for avoiding a statute of limitations, which were not advanced here, the determination of benefits became final when it was not contested. Accordingly, the WCC was without jurisdiction to hear her motion to amend benefits. See §39-71-2401(1), MCA (1999).
¶43 We hold that the WCC erred in increasing the average weekly wage upon which benefits are calculated to $443 per week.
IV. CONCLUSION
¶44 We affirm the judgment of the WCC that Forgey was not a casual employee. We reverse the WCC’s judgment requiring an increase in benefits based on an average weekly wage of $443 per week rather than an average weekly wage of $300.
JUSTICES RICE and DISTRICT COURT JUDGE DAY, sitting for JUSTICE LEAPHART concur.

 This use of the phrase “mutual mistake of fact” is not intended to signal the operation of the legal doctrine of ‘inutual mistake” as it is known in the realm of contract law. Rather, it is merely intended to be descriptive of the misunderstanding shared by Mrs. Forgey and the UEF.