No. 04-310

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 239

RUPERT M. COLMORE, III, a/k/a RUPERT M. COLMORE,
a/k/a RUPERT COLMORE, individually, and COLMORE
MANAGEMENT COMPANY, LLC, as general partner, and
RUPERT M. COLMORE, EUNICE R. COLMORE and FIRST
FARMERS AND MERCHANTS NATIONAL BANK as trustee
for MARY P. COLMORE, VIRGINIA DALE GUILD COLMORE,
and EUNICE BAXTER JACKSON COLMORE, as limited partners,
in COLMORE PROPERTIES, L.P. a/k/a COLMORE PROPERTY
LIMITED PARTNERSHIP,

        Petitioners and Appellants,

    v.

UNINSURED EMPLOYERS' FUND and
JACQUELINE RENEE FORGEY,

        Respondents and Respondents.

APPEAL FROM:    Workers' Compensation Court, State of Montana,
                The Honorable Mike McCarter, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Michael J. Lilly, Berg, Lilly & Tollefson, P.C., Bozeman, Montana

    For Respondent Uninsured Employers' Fund:

        Mark Cadwallader, Special Assistant Attorney General, Department of
        Labor and Industry, Helena, Montana

    For Respondent Forgey:

        Daniel B. Bidegaray and Anna M. Bidegaray, Bidegaray Law Firm, L.L.P.,
        Bozeman, Montana

                Submitted on Briefs:  November 18, 2004
                           Decided:  September 22, 2005

Filed:

                _____
                              Clerk

Justice John Warner delivered the Opinion of the Court.

¶1    Rupert M. Colmore ("Colmore") appeals from a Judgment of the Workers' Compensation Court concluding that the decedent, Douglas Forgey ("Forgey") was Colmore's employee at the time he died in a work-related accident on September 14, 2000, and that Colmore, as an uninsured employer, is required to indemnify the Uninsured Employer's Fund for death benefits paid to Forgey's beneficiaries. We affirm in part and reverse in part.

¶2    We address the following issues on appeal:

¶3    1. Did the Workers' Compensation Court err in concluding that Forgey was not a casual employee and, therefore, was entitled to Workers' Compensation benefits?

¶4    2. Did the Workers' Compensation Court err in determining that an error in calculation of the benefits could be corrected more than a year after benefits were determined?

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶5    Colmore is a long time resident of Tennessee. Colmore retired from farming in Tennessee in 1994. However, he still owned a 400 acre clear-cut parcel in Tennessee that he was in the process of re-planting in 2000. Prior to retiring, Colmore established a limited partnership named Colmore Properties, L.P. ("Colmore Properties"), for the purpose of:

> [I]nvesting in, acquiring, developing, holding, constructing, managing, operating, leasing, subleasing, owning, selling, exchanging, or otherwise dealing in land, buildings, improvements, and any interest or rights therein for agricultural uses and management of natural resources . . . .

Colmore, his wife Eunice and their three daughters are limited partners of Colmore

2

Properties. Colmore Management Company, L.L.C., is the general partner of Colmore Properties. Colmore was the "Chief Manager" of Colmore Management Company.

¶6 Colmore Properties acquired Poison Creek Ranch near Livingston, Montana, in August of 1997. When the ranch was initially purchased, it was primarily used for recreational purposes. The ranch consists of 680 acres and a home. The property was partially fenced, but the house and the fences were in a state of disrepair.

¶7 On January 1, 1998, Colmore individually leased the ranch from Colmore Properties. The purpose of the lease was described as follows:

> The express purpose of this lease is for agricultural purposes only, specifically the grazing and caring of cattle, horses and livestock and the planting of feed grains and other livestock supporting crops; and the exclusive use and occupancy of the house located on the Premises.

The lease required Colmore to maintain the property as follows:

> [L]essee agrees to furnish all necessary material, labor, chemicals, seeds, fertilizers, and equipment to properly apply all necessary fertilizer; treat noxious weeds; maintain the land as agricultural land; plant, grow and harvest seasonal crops on the Premises; and conduct all agricultural practices reasonably related to the growth and harvest of seasonal crops on the Premises and grazing and care of cattle, horses, and livestock, all at the Lessee's sole cost and expense. Lessee shall cultivate the Premises in a good and husbandlike manner in accordance with the best agricultural methods, and in accordance with applicable laws, including environmental laws. Lessee shall be responsible for the maintenance, care and upkeep of the property.

¶8 Colmore Properties paid for the repairs to the home to make it habitable for Colmore and his wife. The Colmores moved into the home in November 1998. They lived there during the summer and returned to Tennessee each year for the winter months. Colmore maintained a small farming operation at Poison Creek Ranch, planting less than an acre of wheat for the purpose of attracting birds to the ranch, and several acres of hay. Colmore

pastured his wife's horses at the ranch and he allowed a neighbor to pasture his horses on the ranch in exchange for looking after the ranch during the winter months. The neighbor also gave Colmore a horse and built a corral on Colmore's property.

¶9 Colmore brought farm equipment with him from Tennessee including three tractors, a plow, a roller, a hay rake, and a grain drill, and the auger involved in Forgey's death. Prior to the incident in question, Colmore had not sold any livestock or crops and had not filed a Montana Income Tax Return. Colmore had not opened a Montana bank account, and handled all of his financial transactions out of his Tennessee accounts.

¶10 Colmore became acquainted with Forgey in 1999 when he was working at a ranch located next to the Poison Creek Ranch. In early August 2000, Forgey told Colmore that he was considering quitting his ranch job and starting his own fencing business. Forgey asked Colmore if he had any fencing work that he could do for him. Colmore said that he did not. In late August, Forgey told Colmore he had quit his job and was starting his fencing business. He asked Colmore if he could give him some work. Colmore agreed to employ Forgey for three to four weeks.

¶11 Colmore agreed to pay Forgey $12 per hour. He also agreed to reimburse him for any materials purchased. Forgey provided his own hand tools, but Colmore provided a tractor and an auger. Forgey began fencing for Colmore on August 10, 2000. Colmore told Forgey which sections of fence to work on and Forgey did the work. On September 14, 2000, while working on the ranch, Forgey, who was working alone, was caught in the auger and died as a result of his injuries. Colmore found his body at the worksite. Over the four weeks that Forgey worked for Colmore he earned $1800, and was paid in cash.

¶12 On April 30, 2001, Jacqueline Renee Forgey ("Mrs. Forgey") filed a beneficiary's claim for compensation with the Montana Department of Labor and Industry ("Department") requesting Workers' Compensation benefits for herself in connection with the death of her husband. She stated in the form, that she signed and filed, that Forgey worked for Colemore for four weeks and was paid $1,800. The Department determined that an employment relationship existed between Colmore and Forgey at the time of Forgey's death. The Department further found that Colmore was required by law to carry Workers' Compensation Insurance for Forgey. Accordingly, the Department ordered Colmore Properties to pay Workers' Compensation benefits to Mrs. Forgey.

¶13 As Colmore Properties failed to provide Forgey with Workers' Compensation Insurance, the Uninsured Employer's Fund ("UEF") began paying benefits to Mrs. Forgey on July 27, 2001.

¶14 Colmore Properties filed a Petition for Dispute Resolution with the Workers' Compensation Court ("WCC") on October 17, 2002. On February 12, 2003, the WCC held a trial to resolve the dispute. On April 18, 2003, the WCC was advised that an additional issue concerning the appropriate wage and compensation needed to be addressed. On May 1, 2003, Mrs. Forgey filed a motion to amend the wage and compensation rate paid by the UEF, thereby requesting an increase in the average weekly wage from $300 to $443. The UEF stipulated that a calculation error was made and $443 was the proper average weekly wage. Counsel for all parties submitted the issue on an agreed statement of facts and documents. The WCC directed the parties to file the agreed statement of facts and briefs for its consideration.

¶15 On March 4, 2004, the WCC entered its Findings of Fact, Conclusions of Law and Judgment, in which it concluded that Colmore, individually, was Forgey's employer, and that Forgey was not a "casual employee" or "independent contractor." Therefore, Colmore was required to provide Workers' Compensation Insurance to Forgey, and Mrs. Forgey was entitled to payment based on an average wage of $443 per week. Colmore's appeal is limited to the WCC's findings that Forgey was not a casual employee and the amount of the benefit payment.

## II. STANDARD OF REVIEW

¶16 We review findings of fact to determine if they are supported by substantial, credible evidence, and we review conclusions of law to determine if they are correct. *Hiett v. Missoula County Pub. Sch.*, 2003 MT 213, ¶ 15, 317 Mont. 95, ¶ 15, 75 P.3d 341, ¶ 15. In Workers' Compensation cases, the law in effect at the time of the claimant's injury establishes the claimant's substantive right to benefits. *Hiett*, ¶ 15.

## III. DISCUSSION

### ISSUE ONE

¶17 **Did the Workers' Compensation Court err in concluding that Forgey was not a casual employee and, therefore, was entitled to Workers' Compensation benefits?**

¶18 Section 39-71-401(1), MCA (1999), provides that "[e]xcept as provided in subsection (2), the Workers' Compensation Act applies to all employers, as defined in 39-71-117, and to all employees, as defined in 39-71-118." Colmore does not dispute on appeal that he is an employer as defined by § 39-71-117, MCA (1999), and that Forgey was his employee as defined by § 39-71-118, MCA (1999). However, Colmore argues that the Workers'

6

Compensation Act ("Act") is not applicable under the facts of this case because Forgey was engaged in "casual employment" as defined in § 39-71-116(7), MCA, and therefore, was exempted from coverage under the Act. *See* § 39-71-401(2)(b), MCA (1999). Casual employment is "employment not in the usual course of the trade, business, profession, or occupation of the employer." Section 39-71-116(7), MCA (1999). The Act does not define "course of trade, business, profession, or occupation."

¶19 Relying on *Miller v. Granite County Power Co.*, 66 Mont. 368, 376-77, 213 P. 604, 607 (*citing Marsh v. Groner* (Pa. 1917), 102 A. 127, 129) and *Nelson v. Stukey* (1931), 89 Mont. 277, 300 P. 287, in which this Court stated that the word "business" means the "habitual or regular occupation that a person [is] engaged in with a view to winning a livelihood or gain," Colmore argues that he was not engaged in a "trade, business, profession, or occupation" because he did not lease the ranch to earn a livelihood. Accordingly, Colmore argues that Forgey's employment on the ranch was "casual employment," which exempted Forgey from mandated Workers' Compensation coverage. Colmore also relies on *Vogl v. Smythe* (Idaho 1953), 258 P.2d 355, and *Barlow v. Anderson* (Tex. Civ. App. 1961), 346 S.W.2d 632, for the proposition that employment is not in the usual course of trade, business, profession or occupation when there is no profit motive involved.

¶20 Colmore argues that the WCC's Findings of Fact support the conclusion that Colmore was not engaged in any trade, business, profession or occupation, because he had retired from farming in Tennessee in 1994; maintained minimal agricultural operations on the ranch; had not filed a Montana tax return or opened a bank account in Montana; and Colmore only

7

lived in Montana part of the year.

¶21 Colmore further argues that the fact that he deducted the expenses associated with the ranch on his Federal Income Tax Return; signed a lease with Colmore Properties for the purpose of grazing cattle, horses and livestock, for planting grain and other livestock supporting crops; and intended to develop the ranch for agricultural purposes, provide insufficient proof that he relied on the ranch to earn a livelihood or to make a profit.

¶22 As we previously have stated, "[t]he line of demarcation between what is and what is not employment in the usual course of trade, business, profession, or occupation of the employer is vague and shadowy." *Nelson*, 89 Mont. at 286, 300 P. at 288. Therefore, such determination must be made on a case-by-case basis and a single employer may, in fact, have more than one trade or business. *Nelson*, 89 Mont. at 286, 300 P. at 288-89.

¶23 This Court has drawn the following distinction between improvements to property that constitute activities in the usual course of business and those which do not:

> The mere owning of a house, maintaining it, and keeping it in repair and renting it, so that it may produce an income, is not sufficient to constitute a business, nor does the owning and renting of more than one house necessarily constitute a business; but such transactions at most only amount to a regular business, within the meaning of the compensation act, when they are carried on to such an extent as to require a substantial and habitual devotion of time and labor to their management and operation.

*Nelson*, 89 Mont. at 289, 300 P. at 290 (quoting 50 A.L.R. 1177).

¶24 In *Nelson*, we held that a worker injured while building an addition to an apartment complex owned by a dentist was employed in the usual course of the dentist's business. *Nelson*, 89 Mont. at 288, 300 P. at 289. We reached this conclusion because the dentist was also engaged in the business of being the owner and operator of a 15 unit apartment complex,

8

and the construction work was being done in the furtherance of his existing rental business. *Nelson*, 89 Mont. at 288-89, 300 P. at 289-90.

¶25 Here, as in *Nelson*, Colmore hired Forgey to complete a task that was in furtherance of his existing business–running an agricultural operation. *See Nelson*, 89 Mont. at 288-89, 300 P. at 289-90. The fact that Colmore may have been engaged in other businesses, including Colmore Properties and Colmore Management Company, is inconsequential in our analysis. *See Nelson*, 89 Mont. at 286, 300 P. at 288-89. The fact that Forgey was only employed temporarily is also not significant. *See Industrial Accident Board v. Brown Bros. Lumber Co.* (1930), 88 Mont. 375, 381-82, 292 P. 902, 904 (holding that a worker injured while helping a truck driver get his lumber truck out of the mud was employed in the usual course of the lumber company's business even though he was employed to complete a single task).

¶26 The important fact is that Forgey was employed to work for Colmore in the course of his agricultural business, and that Forgey's only occupation at the time was to repair and replace fences for Colmore. *See Carlson v. Cain* (1983), 204 Mont. 311, 321, 664 P.2d 913, 918 (holding that the fiancé of a newspaper carrier hired to deliver papers was employed in the usual course of the newspaper's business when she was injured in a car accident while making deliveries).

¶27 The facts in this case are distinguishable from those in *Vogl* and *Barlow*. In *Vogl*, the employer was not required to provide Workers' Compensation coverage for a worker he hired to clear a road to his summer home because it was maintained separately from his business properties. *Vogl*, 258 P.2d at 357. Here, Colmore hired Forgey to replace and

9

repair fencing on a working ranch that Colmore leased as a tax write-off to decrease his federal income tax on other income-producing ventures. In spite of what Colmore would have us believe, the ranch was not maintained solely as a summer vacation home.

¶28 Likewise in *Barlow*, the employer was not required to provide Workers' Compensation coverage for his horse trainer because there was no evidence that he kept the horses for profit – he did not breed the horses or sell them, but kept them merely as an expensive hobby. *Barlow*, 346 S.W.2d at 633-34. By contrast, while Colmore claims he leased the ranch as a hobby, he deducted all of the expenses of running the ranch as "business" expenses on his Federal Income Tax Return. Therefore, even though he did not make a profit running the ranch, he did operate the ranch with a profit motive in mind – that of reducing his overall income tax through the business expenses he incurred while operating the ranch. We agree with the Texas Court of Appeals when it said:

> We do not believe it is necessary to come within the Workmen's Compensation Act that the 'employer' must make a profit but we do believe the profit motive is an important characteristic of an operation such as the one we are here considering in order for the operation to come within the designation of a trade, business, profession or occupation.

*Barlow*, 346 S.W.2d at 634.

¶29 Colmore leased the property from his limited partnership for the express purpose of running an agricultural business. Under the terms of the lease, Colmore was obligated to furnish all of the material, labor, and equipment necessary to maintain the land as agricultural land. Colmore was also required by the terms of the lease agreement to carry business risk and liability insurance to cover any claims arising out of the agricultural operations of the ranch.

10

¶30 As part of the ranch operations, Colmore leased pasture land to area ranchers for grazing purposes and was responsible for maintaining the fences on the property. Colmore admitted in his deposition that he had hired at least two other people to repair and replace fences on the property in addition to the work Forgey was hired to complete. Colmore also allowed a local rancher to run horses on his property. In exchange, the horse owner built a corral on Colmore's property and gave Colmore a horse. The rancher also fed Colmore's horses and kept an eye on the property while Colmore was in Tennessee for the winter.

¶31 Perhaps most significantly, Colmore deducted $140,983 from his federal income taxes, in 2000, based on the agricultural deductions and depreciation claimed for both his Montana and Tennessee farming operations. Colmore claimed deductions for the rent he paid to lease the ranch, depreciation on the farm equipment, and for payment of Montana taxes. Additionally, Colmore claimed deductions for expenses incurred from repairing the fences on the ranch.

¶32 These facts are sufficient to support the conclusion of the WCC that Colmore operated the ranch with a profit motive, thereby qualifying Forgey's employment for Workers' Compensation coverage. *See White v. Comm. of Internal Revenue* (6th Cir. 1955), 227 F.2d 779, 779 (a profit motive is necessary to deduct ordinary and necessary business expenses on a federal income tax return).

¶33 We conclude that the WCC did not err in concluding Forgey was not a casual employee and, therefore, was entitled to Workers' Compensation benefits.

**ISSUE TWO**

¶34 **Did the Workers' Compensation Court err in determining that an error in**

11

**calculation of the benefits could be corrected more than a year after benefits were determined?**

¶35 Section 39-71-520, MCA (1999), provides that "[a] dispute concerning uninsured employers' fund benefits must be appealed to mediation within 90 days from the date of the determination or the determination is considered final."

¶36 Colmore argues that the WCC erred in concluding that § 39-71-520, MCA (1999), did not prohibit the UEF from correcting a calculation error and from increasing the weekly payments to Mrs. Forgey because she failed to appeal the determination of benefits within the 90 days allowed by law. We agree.

¶37 The UEF notified Mrs. Forgey by letter dated July 27, 2001, that she was entitled to death benefits based on an average weekly wage of $300. The letter included the following explanation of how the benefits were calculated:

> Pursuant to Section 39-71-721(2), MCA, your Beneficiary entitlement is calculated as follows: $1,800.00 (total earnings) / 6 (total weeks worked) = $300.00 (Average Weekly Wage)
> $300.00 * 2/3 = $200.00 (Weekly Rate)

The letter also specifically stated:

> If you do not agree with any of the determinations or calculations contained in this letter, you may request mediation. Under section 39-71-520 of the Workers' Compensation Act if you do not appeal this decision within 90 days this determination is considered final.

This notice is not in legalese. It is easily read by a layperson. It made clear to Mrs. Forgey, and anyone else who bothered to read it, that it is calculated on six weeks of earnings. Further, it makes it clear that it is a final determination if not contested in 90 days. When Mrs. Forgey filed the First Report of Injury with the Department of Labor on April 30, 2001,

12

she clearly indicated that her husband earned $450 per week. Therefore, it is not unreasonable to expect that Mrs. Forgey should have recognized that the UEF made an error in calculating Forgey's average weekly wage by dividing $1800 by 6, instead of 4 weeks. Both Mrs. Forgey and Colmore had 90 days to appeal the decision to the UEF. Colmore appealed the decision on the grounds that Forgey was an independent contractor, or in the alternative, was a casual employee, and therefore, was not entitled to benefits. Colmore's appeal was mediated on September 6, 2001, in accordance with the procedures set forth in § 39-71-520, MCA (1999). When the attempt at mediation failed, Colmore filed a petition for dispute resolution with the WCC.

¶38 Mrs. Forgey argues that because Colmore appealed the UEF's decision to grant benefits within the 90 days provided by statute, that she was relieved from her statutory duty to cross-appeal the calculation of Forgey's average weekly wage. She further argues that she could not have appealed within 90 days because she did not become aware of the mistake in calculation until much later.

¶39 This Court has long held that the time limits for filing an appeal are mandatory and jurisdictional. *Joseph Eve & Co. v. Allen* (1997), 284 Mont. 511, 514, 945 P.2d 897, 899. Therefore, an appellant has a duty to perfect its appeal in the manner provided by statute. *Joseph*, 284 Mont. at 514, 945 P.2d at 899. Absent such compliance, this Court lacks jurisdiction to hear the appeal. *Joseph*, 284 Mont. at 514, 945 P.2d at 899. In a similar fashion, this Court has held that failure to properly file a cross-appeal precludes this Court from addressing the issues raised in the cross-appeal. *Joseph*, 284 Mont. at 514, 945 P.2d at 899. A cross-appeal is necessary where the respondent seeks review of matters "separate

13

and distinct" from those sought to be reviewed by the appellant. *Joseph*, 284 Mont. at 514, 945 P.2d at 899 (citing *Johnson v. Tindall* (1981), 195 Mont. 165, 170, 635 P.2d 266, 268).

¶40 More than two parties are involved in this case. UEF and Mrs. Forgey may agree to ignore the time requirement of § 39-71-520, MCA (1999). However, they and the dissent ignore the rights of Colemore, the one who would be required to make the increased payment if this Court were to affirm the order of the WCC. Colemore made no stipulation to increase the average weekly wage calculation some 17 months after it became final by law. He had the right to rely on the amount fixed in considering his position in this litigation and in going about his business. The question of whether UEF is responsible to Mrs. Forgey is not before us. As far as Colemore is concerned, Mrs. Forgey had a statutory duty to follow the same procedure as Colmore because the issue she raised regarding the proper amount of benefits was separate and distinct from the issue raised by Colmore as to whether benefits should have been provided in the first place. She failed to appeal the issue to the UEF. Had she done so, and had the issue not been resolved through mediation, she too could have filed a petition with the WCC to resolve the dispute. It was not until sometime during discovery in the underlying case that her attorney noticed what he believed was the error. On May 1, 2003, he filed a motion with the WCC requesting that the court order the error corrected, even though the determination of benefits became final at the end of October 2001 and had not been properly appealed to the UEF.

¶41 The WCC considered the motion to amend during trial in spite of the fact that the issue was not properly before the court, as mediation is a prerequisite to filing a petition in the WCC, and a failure to request mediation bars the court from reviewing UEF

14

determinations. Sections 39-71-2401(1), 2408(1), and 2905(1), MCA (1999). In increasing the benefit amount, the WCC erroneously relied on *South v. Transportation Ins. Co.* (1996), 275 Mont. 397, 401, 913 P.2d 233, 235, in which this Court concluded that full and fair settlement agreements are contracts and may be rescinded if parties were laboring under mutual mistake regarding material fact, at the contracts inception, which impacted the agreement to such a degree that the contract may be rescinded. However, there was no settlement contract in this case. Section 39-71-520, MCA (1999), places a limitation on the time within which a claimant may dispute a determination of benefits regardless of the merits of her position.

¶42    The notice sent to Mrs. Forgey was designed to tell her, without the necessity of hiring a lawyer, the average weekly wage upon which her benefits would be calculated. UEF advised her of this fact and also how her benefits would be calculated, in plain English. She may not have examined the notice, and may not have realized that UEF had made a mistake. UEF presumably did not realize it miscalculated the average weekly wage. However, a statute of limitations for actions based on a mistake does not depend on actual discovery of the alleged mistake before it begins to run. *D'Agostino v. Swanson* (1989), 240 Mont. 435, 443, 784 P.2d 919, 924. Rather, the limitations period begins to run when the facts are such that the party seeking relief would have discovered the mistake had he exercised ordinary diligence. *D'Agostino*, 240 Mont. at 443, 784 P.2d at 924; *Gregory v. City of Forsyth* (1980), 187 Mont. 132, 136, 609 P.2d 248, 251. In the exercise of ordinary diligence UEF should have realized that it miscalculated the average weekly wage, as should have Mrs. Forgey. Absent grounds for avoiding a statute of limitations, which were not advanced here,

the determination of benefits became final when it was not contested. Accordingly, the WCC was without jurisdiction to hear her motion to amend benefits. *See* § 39-71-2401(1), MCA (1999).

¶43 We hold that the WCC erred in increasing the average weekly wage upon which benefits are calculated to $443 per week.

## IV. CONCLUSION

¶44 We affirm the judgment of the WCC that Forgey was not a casual employee. We reverse the WCC's judgment requiring an increase in benefits based on an average weekly wage of $443 per week rather than an average weekly wage of $300.

/S/ JOHN WARNER

We Concur:

/S/ JIM RICE
/S/ GARY DAY
District Court Judge Gary Day
sitting in for Justice Leaphart

16

Chief Justice Karla M. Gray, specially concurring.

¶45    I join the Court's opinion on issue one.  I concur in the Court's resolution of issue two, but not in all that is said in that regard.  In addition, with due respect for the dissent's understandable desire that Mrs. Forgey receive the benefit to which she would have been entitled under different circumstances because of the erroneous original calculation of benefits by the UEF, I cannot agree with the analysis presented to reach such a conclusion.  Moreover, while the dissent presents many arguments not raised by Mrs. Forgey, I address portions of the dissent below.

¶46    In my view, the following facts are pertinent to the appropriate resolution of issue two.  Mrs. Forgey filed a claim for death benefits in April of 2001, at which time she was 33 years old.  She filled in the required form by hand and, insofar as we can determine, was not represented by counsel at that time or at any time prior to--or soon after--the UEF's decision.  Mrs. Forgey's claim form reflects that she claimed benefits based on her deceased husband's gross earnings of $1,800 while working for Colmore for four weeks.  The "four pay period" time frame for which she supplied his gross earnings is part of the printed form.  Eighteen hundred dollars divided by four weeks results in an average weekly wage for Mr. Forgey of approximately $450 per week for the purpose of calculating the benefits to which Mrs. Forgey might be entitled.

¶47    On July 27, 2001, the UEF notified Mrs. Forgey by letter that her benefits entitlement was calculated as

$1,800.00 (total earnings)/6 (total weeks worked) =$300.00 (Average Weekly Wage)
$300.00 * 2/3 = $200.00 (weekly rate)

17

(Emphasis added.) The final substantive paragraph of the letter stated, in its entirety:

> If you do not agree with any of the determinations or calculations contained in this letter, you may request mediation. Under section 39-71-520 of the Workers' Compensation Act if you do not appeal this decision within 90 days this determination is considered final. To obtain the appropriate forms, contact the Workers' Compensation Claims Assistance Bureau, Mediation Unit, P.O. Box 1728, Helena, Montana 59624 or call (406) 444-6534.

Mrs. Forgey did not "request mediation" or "appeal this decision" within 90 days. Indeed, it appears likely she did not notice the discrepancy between her claim, as submitted, and the UEF's final decision within the 90-day period.

¶48 Colmore timely sought dispute resolution in the WCC. The WCC held a two-day trial on one day in February, and one day in April, of 2003. During the second day of trial, the parties informed the WCC that an issue had arisen regarding the proper rate of benefits. On May 1, 2003, Mrs. Forgey formally moved to amend the UEF's compensation rate. The parties submitted an agreed statement of facts, which included that the original UEF calculation was erroneous and that Mrs. Forgey had not timely objected. The WCC ultimately concluded that § 39-71-520, MCA (1999), did not preclude Mrs. Forgey from receiving the corrected amount of benefits.

¶49 These relevant facts require that we first focus on § 39-71-520, MCA (1999), which provides that "[a] dispute concerning uninsured employers' fund benefits must be appealed to mediation within 90 days from the date of the determination or the determination is considered final." As stated in the UEF's letter to Mrs. Forgey--written in less "legalese" than the statute--any disagreement with determinations or calculations contained in the UEF's decision must be raised within 90 days and, absent objection within that time, the UEF's determination is final.

18

¶50     The statute clearly constitutes a 90-day statute of limitations for a claimant seeking further action on a UEF determination. Whether we focus on the word "dispute," used in § 39-71-520, MCA (1999)--as relied on by the dissent--or the phrase "disagreement with determinations or calculations"--contained in the UEF's letter--Mrs. Forgey had 90 days to review the UEF's calculations and, if she disputed or disagreed with them, seek her statutory remedy. She did not so do. On that basis, I join the Court in concluding that no issue regarding the UEF's calculation of the benefits to which Mrs. Forgey was entitled survived the 90-day period of limitations.

¶51     Moreover, it is my view that our recent decision in *Hand v. UEF*, 2004 MT 336, 324 Mont. 196, 103 P.3d 994, is analogous. There, the claimant filed a claim for benefits under the Occupational Disease Act (Act). At some subsequent time, the Department of Labor and Industry (Department) entered an Order of Determination finding that the claimant had an occupational disease and was entitled to certain benefits under the Act. The claimant appealed pursuant to § 39-72-612, MCA (1997), which provided a 20-day limit for appeal-- absent which the Order would become final--and the case continued to the WCC. The UEF did not appeal from the Department's Order, but attempted to have portions of it reviewed and changed in the WCC. *See Hand*, ¶¶ 8, 11, 12.

¶52     Notwithstanding the 20-day limit to appeal the Department's Order contained in § 39-72-612, MCA (1997), the WCC allowed the UEF to raise substantive affirmative defenses. On appeal, we concluded the UEF lost its opportunity to have the Department's findings and conclusions reviewed by failing to timely perfect its appeal from the Department's Order of Determination, and that the Order had become final as to the UEF after the 20-day

limitations period. *See Hand*, ¶ 27.

¶53 Pursuant to our reasoning in *Hand*, Mrs. Forgey is as barred in the present case from late-raising issues that became final 90 days after the UEF's determination as the UEF was barred in *Hand*. All of us no doubt have sympathies to Mrs. Forgey's plight; however, it is our obligation to apply the law as it is written and to do so evenhandedly. In both *Hand* and the present case, one party timely "appealed" and one party did not. The result in both cases must be the same.

¶54 On this latter point, applying the law as written, the dissent repeatedly suggests that the Court has failed to set forth the applicable rules of statutory construction. There is some truth here. At least as important, however, is the dissent's purported reliance, in ¶ 77, on the "plain meaning" rule, and its own interpretations of § 39-71-520, MCA (1999).

¶55 I agree generally with the definitions of "dispute" and related terms advanced by the dissent. One could hardly disagree that Black's Law Dictionary contains these definitions.

¶56 From these undisputed--at least by me--definitions, however, the dissent travels to several very interesting places. It states without equivocation--and also without authority-- that a dispute cannot exist unless it is expressed. Thus, no expression of dispute equals no dispute. This is a sympathetic interpretation in the present case. The plain words used in the statute do not support it. If the Legislature intended to say "if you get around to expressing a dispute within 90 days, go for it, but if you don't get to it until some later time, that's OK too," it could readily have said so. Clearly, it did not.

¶57 The dissent also relies on a "mutual mistake of fact" notion in the context of its plain

20

meaning analysis. Apparently, the dissent believes the plain meaning of the statute of limitations contained in § 39-71-520, MCA (1999), is that if, two years after a determination is final, one party "discovers" an error and the other party agrees that an error was made, the original determination never became final. Indeed, what the dissent seems to contend for, in an overall sense, is the insertion of the clause "or the date the dispute is discovered" into the existing language of § 39-71-520, MCA (1999). While in this case that language would achieve a sympathetic result, the fact remains that the statute simply says nothing of the sort.

¶58 The dissent also urges that nothing in the plain meaning of the statute indicates that *all* determinations are final if not appealed within 90 days. The statute says what it says: "[a] dispute concerning [UEF] benefits must be appealed to mediation within 90 days from the date of the determination or the determination is considered final." Little more need be said, except to note that nothing in the statute indicates that some determinations are *not* final if not appealed within 90 days. Moreover, additional clarity for a proper understanding of the situation by a lay person--if any were needed--was provided in the UEF's determination letter.

¶59 The dissent also attempts to tie the "plain meaning" of § 39-71-520, MCA (1999), to the language contained in § 39-71-601(1), MCA (1999), on the *Orr* "context in which they reside" theory. I agree wholeheartedly that the language used by the Legislature in these two statutes is very different. I observe, however, while both statutes are part of the Workers' Compensation Act, the statutes in Title 39, chapter 71, part 5--including § 39-71-520, MCA (1999)--apply expressly to "uninsured" employers in the context of UEF proceedings. Section 39-71-601(1), MCA (1999), on the other hand, is contained in part 6 of the Act,

21

captioned "Claims for Benefits." The dissent's effort to read something into these two different statutes is murky at best.

¶60 The dissent properly highlights the Legislature's public policy in the workers' compensation arena. Indeed, § 39-71-105(3), MCA (1999), clearly provides that the system is "intended to be primarily self-administering[, and] minimize reliance upon lawyers and the courts to obtain benefits and interpret liabilities." In the present case, Mrs. Forgey, a lay person, competently and correctly filled out the simple UEF claim form. Upon receiving the UEF's determination on her claim, she could just as easily and competently have reviewed the claim she had submitted and seen that the UEF's calculation was based on a 6-pay-period length of time, rather than the 4-pay-period time frame required by the form she had completed. In other words, had Mrs. Forgey taken the time to merely contrast her claim with the UEF's calculation, I am confident she would have timely followed the instructions in the UEF letter. She did not act with diligence in performing this simple task and, consequently, the 90-day limitations period came and went. *See D'Agostino*, 240 Mont. at 443, 784 P.2d at 924. As a consequence, under § 39-71-520, MCA (1999), the UEF's determination became final.

¶61 The dissent urges that the Court's decision on this issue will force lay people to "either have to become proficient in the fine points of benefit calculation, or employ professional legal assistance" in reviewing the UEF's benefits calculations, all in contravention of the public policy set forth in § 39-71-105(3), MCA (1999). Under the facts of this case, I cannot agree. The UEF's letter determination set forth precisely how the calculation was performed. Even I--known by virtually every one who knows me (and

22

readily admitted by me) to be "numerically challenged"--can readily see, by a quick comparison with Mrs. Forgey's claim, the UEF's error. I believe that, having seen the error, I would have followed the clear instructions contained in the letter setting forth how I should proceed if I did not agree with the calculation and how to obtain assistance. Mrs. Forgey could as easily have done so.

¶62 The dissent goes on to contend that, because Mrs. Forgey did not timely discover the error as she could have done, no "dispute" existed under § 39-71-520, MCA (1999). To follow this logic to its natural conclusion would, in essence, be the end of statutes of limitations.

¶63 The purpose of statutes of limitations is to suppress stale claims for purposes of basic fairness. *Gomez v. State*, 1999 MT 67, ¶ 25, 293 Mont. 531, ¶ 25, 975 P.2d 1258, ¶ 25. Under the dissent's logic, no limitations period for taking an appeal or the next step in an administrative proceeding would exist so long as no one bothered to check on whether a dispute *should* exist. Appeals or next step requirements with time limitations are intended to require a person to timely determine whether a dispute or disagreement exists, from her or his standpoint, with the outcome of a proceeding. I cannot conceive that the dissent would conclude that a person involved in a civil action in a district court--whether represented or appearing *pro se*--could simply ignore the usual 30-day time for filing a notice of appeal from a trial court's final judgment to this Court on the basis that she or he did not have a "dispute" at that time, but might get around to discovering one later. Our cases are legion that, absent a timely appeal, we are without jurisdiction to consider an appeal. *See*, *e.g.*, *In re Matter of M.B.* (1997), 282 Mont. 150, 152-53, 935 P.2d 1129, 1130 (citation

23

omitted).

¶64 Moreover, the dissent's reliance on the "mutual mistake of fact, acknowledged by both parties," is somewhat misleading. It is arguable that the "mistake of fact" was really a mistake of fact and law. In any event, however, the UEF's erroneous calculation was not a mutual mistake of any kind at the time of its occurrence. Nor was the calculation "reached" pursuant to a mutual mistake as the dissent states. The UEF's erroneous calculation was simply an error, but one which could readily be seen. That the UEF made an error is unfortunate. However, the reality is that we all make mistakes. The intent of § 39-71-520, MCA (1999), is to encourage claimants to timely review the UEF's calculations and determinations and, if a disagreement or dispute arises, to timely take the next step required by law or lose the ability to do so.

¶65 In summary, I agree with the dissent that Mrs. Forgey originally was entitled to benefits based on 4 weeks of work at an average weekly wage calculation of $443. I disagree with the dissent's position that she remained entitled to benefits based on that average weekly wage calculation after letting the 90-day period of limitations run. Had a party in an ordinary civil action failed to file a timely notice of appeal either to a district court from a court of limited jurisdiction or to this Court from a district court, the party would--by its own inaction--no longer be entitled to the relief which might have been available on appeal. I cannot see that this case is any different.

¶66 For the reasons stated, I join in the Court's conclusion that the Workers' Compensation Court erred in increasing the average weekly wage upon which Mrs. Forgey's benefits are calculated.

/S/ KARLA M. GRAY

Justice James C. Nelson concurs and dissents.

¶67     I concur with our decision as to Issue One.  I disagree with our resolution of Issue Two and, therefore, dissent.  I would affirm the Workers' Compensation Court as to both issues.

¶68     Issue Two turns on a statute that contains a time period for advancing an appeal.  This time period begins to run, as do all statutory time periods, upon the existence of certain specified conditions.  Here, the statute at issue provides that the existence of a "dispute" is a prerequisite condition for the running of this time period.  Thus, the "dispute" requirement is just that--a requirement.  It is not a condition which courts are free to disregard when they see fit.  Yet, the Court has ignored this requirement, and has effectively undercut the legislature's public policy determination regarding our interpretation of Workers' Compensation laws.

¶69     Five things are undisputed as to Issue Two.  First, the UEF--the State agency in charge of correctly calculating UEF benefits--made an error in calculating Mrs. Forgey's benefits.  This error substantially impacted her benefits by reducing the calculation of Mr. Forgey's average weekly wage from $443.00 to $300.00--a 32% reduction.  Second, the UEF stipulated that it made the error and that the error should be corrected.  Third, Mrs. Forgey not only did not know of the error--she relied on the State agency charged with correctly calculating her benefits--but also, and more importantly, by the time she, through her attorney, discovered the error, her cross-appeal time had long since passed.  Fourth, upon discovering the error, Mrs. Forgey immediately notified the UEF and Colmore's counsel and

26

filed a motion to correct the clerical error. Fifth, Colmore stipulated that the UEF's initial benefit calculation was flawed, and that Mr. Forgey's average weekly wage was in fact $443.00. The error at issue here was simply a ministerial mistake unilaterally made by the agency and mutually acknowledged by the UEF, the claimant, and the uninsured employer. There was no dispute involved and none to appeal.

**Statutory Interpretation**

¶70    Section 39-71-520, MCA (1999), requires that a "dispute" concerning uninsured employers' fund benefits must be appealed to mediation within ninety days from the date of determination or the determination is considered final. Here, there was no "dispute" at issue during the ninety days after the UEF's benefit determination because Mrs. Forgey, not surprisingly, was unaware that the UEF had erred in computing her benefits. Indeed, there was a mutual mistake of fact[1] by both the UEF and Mrs. Forgey as to the determination of benefits--both parties thought the benefit amount was computed correctly, but both parties were wrong. While § 39-71-520, MCA (1999), provides specific guidelines for the resolution of disputes over benefit calculations, it says nothing of corrective re-calculations where no such dispute has ever existed. Nonetheless, the Court disregards the plain language of the statute and thereby bars a re-calculation of benefits based on an average weekly wage of $433.00--a figure which Colmore, Mrs. Forgey, and the UEF have all agreed is correct.

---

[1] This use of the phrase "mutual mistake of fact" is not intended to signal the operation of the legal doctrine of "mutual mistake" as it is known in the realm of contract law. Rather, it is merely intended to be descriptive of the misunderstanding shared by Mrs. Forgey and the UEF.

¶71 The Court fails to acknowledge that resolution of this issue requires statutory interpretation and, consequently, fails to utilize or cite to any rules of statutory construction in rendering its simplistic interpretation of the statute at issue here. This failure is necessary to the Court's Opinion, because not a single rule of statutory construction supports its interpretation of § 39-71-520, MCA (1999). Moreover, this failure is indicative of the Court's casual approach to the interpretation of this statute, which amounts to nothing less than a revision thereof.

¶72 Proper interpretation of this statute requires that we first consider what a "dispute" is. The Workers' Compensation Act does not define this term. Black's Law Dictionary, 8th Edition, defines a "dispute" as a "conflict or controversy, esp. one that has given rise to a particular lawsuit." In turn, Black's defines a "controversy" as a "disagreement or a dispute" and a "justiciable dispute." Further, Black's defines a "disagreement" as a "difference of opinion" or a "quarrel." These definitions indicate that a "dispute" can not exist unless a party expresses an argument. Such an expression is inherent in the existence of a "controversy" or "disagreement" and is, of course, necessary to the existence of any lawsuit. In other words, the very nature of a "dispute" is the clashing of stated ideas or claimed positions. This conclusion is supported by Black's definition of a justiciable dispute as a dispute that is "capable of being disposed of judicially." Obviously, no dispute can be "disposed of judicially" without an expression of argument from at least one party, which is initially made in the pleadings, because no court can take notice of a dispute unless it is presented by way of an expression of argument.

28

¶73   Our jurisprudence regarding the issue of standing provides further support for the conclusion that a "dispute" necessarily entails an expression of argument. Standing is a threshold issue in every case. *In re Parenting of D.A.H.*, 2005 MT 68, ¶ 7, 326 Mont. 296, ¶ 7, 109 P.3d 247, ¶ 7. "[A] court that would otherwise have jurisdiction to hear and decide a matter will not have jurisdiction if a person without standing attempts to bring the action." *In re Parenting of D.A.H.*, ¶ 8. As our case law holds:

> In the context of challenges to government action, we have stated that the following criteria must be satisfied to establish standing: (1) The complaining party must *clearly allege* past, present or threatened injury to a property or civil right; . . . .

*Armstrong v. State*, 1999 MT 261, ¶ 6, 296 Mont. 361, ¶ 6, 989 P.2d 364, ¶ 6 (emphasis added). Thus, we see that no judicially cognizable dispute exists without an expression of argument.

¶74   Based on the foregoing, I conclude that a "dispute" necessarily entails an expression of argument. That is not to suggest that this conclusion should be the starting point of reference in every consideration of the term "dispute." This term appears in various statutes throughout the Workers' Compensation Act, and may well take on different nuances of meaning depending on the context and manner in which it is used. Here, the term "dispute" is used in a unique and primary fashion--i.e., it is designated as the event which triggers the running of the ninety-day time period for appeal. As such, I believe it is necessary to consider the essence of a "dispute" in order to determine whether one occurred here.

¶75   Neither Colmore nor Mrs. Forgey expressed any argument regarding the UEF's determination of benefits during the ninety days after the initial calculation. Because no arguments were expressed, no dispute existed. The fact that a mistake had been made does

29

not establish the existence of a dispute. Further, to the extent we can attach any meaning to the silence of the parties, it appears that all were in agreement regarding the benefits determination. The Special Concurrence claims that the natural conclusion of this reasoning would spell the end of statutes of limitations. This hyperbole demonstrates either a failure to recognize or, worse, the bald refusal to acknowledge the unique nature of the statute at issue. More to the point, an interpretation of § 39-71-520, MCA (1999), which gives effect to its unique use of the term "dispute" would have no bearing on a statute that does not employ that term in the context used here.

¶76    Having found some meaning in the term "dispute," a word which the Court apparently refuses to recognize, I now turn to the consequences of such meaning in light of the rules of statutory construction.

¶77    In construing a statute, the intent of the legislature is controlling, and such intent must first be determined from the plain meaning of the words used. *Security Bank v. Connors* (1976), 170 Mont. 59, 66-67, 550 P.2d 1313, 1317. Here, the plain meaning of the words at issue indicate that only "disputes" must be appealed to mediation within ninety days. The term "dispute" precedes and qualifies the requirement of appeal in this statute. Thus, a claimant has no duty to appeal if no dispute exists.

¶78    If we are to allow this term to retain any meaning apart from the term "agreement," which is essentially what Mrs. Forgey and the UEF had reached pursuant to a mutual mistake of fact, we must conclude that § 39-71-520, MCA (1999), designates an appeal time for "disputes" only. As the Special Concurrence notes, our obligation is to apply the law as it is written. In doing so, we must recognize that the term "dispute" has some meaning

30

which is consequential in the operation of the statute. Unfortunately, the Court and the Special Concurrence choose to render this term meaningless.

¶79 General rules of statutory construction require this Court to interpret the statutory language before us without adding to it or subtracting from it. *Orr v. State*, 2004 MT 354, ¶ 68, 324 Mont. 391, ¶ 68, 106 P.3d 100, ¶ 68. Here, the Court engages in either significant addition to or subtraction from § 39-71-520, MCA (1999), thereby rewriting it. It appears that the Court has either removed the term "dispute," which is a prerequisite to the application of this statute, or has added some other undisclosed phrase which renders the term "dispute" meaningless. In other words, the Court's approach requires us to either: (1) assume that a "dispute" exists immediately and in every single case; or (2) ignore the "dispute" requirement altogether.

¶80 Words and phrases used in the statutes of Montana are construed according to the context in which they reside. *Orr*, ¶ 68. The Court treats § 39-71-520, MCA (1999), as a typical statute of limitations. However, the legislature clearly set this statute apart from the general statute of limitation governing presentment of claims under the Workers' Compensation Act, which appears just a few code sections after the statute at issue in the case *sub judice*. That statute of limitations provides:

> In case of personal injury or death, *all* claims must be forever barred unless signed by the claimant or the claimant's representative and presented in writing to the employer, the insurer, or the department, as the case may be, within 12 months from the date of the happening of the accident, either by the claimant or someone legally authorized to act on the claimant's behalf.

Section 39-71-601(1), MCA (1999) (emphasis added). Obviously, this provision includes more comprehensive and restrictive language than is used in the statute at issue here, in that

31

it clearly bars any recourse for *all* claims not pursued within the applicable time period.  If the legislature had intended that § 39-71-520, MCA (1999), be treated as a typical statute of limitations, thereby operating to bar any recourse not pursued within ninety days from the time of initial benefit calculation, then the legislature would have undoubtedly used language similar to that of § 39-71-601(1), MCA (1999), as it has done with the various other statutes of limitations found in Montana's code.  Instead, the legislature chose to qualify § 39-71-520, MCA (1999), with the term "dispute," as opposed to the phrase "all claims," thereby rendering it significantly distinct from a typical statute of limitations.  We should honor that choice by giving effect to the term "dispute" which qualifies the rest of the language in the statute.  The Court's refusal to do so amounts to nothing less than a judicial revision of § 39-71-520, MCA (1999).

¶81     When considered in the context of the Workers' Compensation Act, particularly with reference to the Act's statute of limitations, it becomes abundantly clear that the legislature did not intend that § 39-71-520, MCA (1999), operate as a typical statute of limitations.  I conclude that the Court's statutory construction here is flawed because it makes § 39-71-520, MCA (1999), and § 39-71-601(1), MCA (1999), operate in the same way despite their substantial facial differences.

¶82     As we have previously stated:

> Courts have developed many principles for interpreting statutes.  Each principle is designed to give effect to the legislative will, to avoid an absurd result, to view the statute as a part of a whole statutory scheme and to forward the purpose of that scheme.

*Orr*, ¶ 25.  Here, the Court's interpretation has undermined each one of these principles.  Disregarding the plain meaning of the term "dispute" thwarts the legislative will expressed

32

through the unique structure of this statute. Further, an absurd result obtains in that the UEF is denied the opportunity to make a remedial calculation of benefits which it argues would be proper, thereby denying a widow the full measure of the statutorily established death benefit because of a mutual mistake of fact. Finally, the Court's interpretation assigns § 39-71-520, MCA (1999), the same meaning as the general statute of limitations of the Workers' Compensation Act, ignoring the distinct nature of the two statutes and thereby failing to view this statute as a part of a whole statutory scheme. In short, the rules of statutory interpretation call for a different result than the Court has reached.

¶83 The Special Concurrence concludes that our decision in *Hand v. Uninsured Employers' Fund*, 2004 MT 336, 324 Mont. 196, 103 P.3d 994, is analogous to the present case. Our resolution of that case was premised on § 39-72-612(1), MCA (1997). That statute specifies a twenty-day time period in which a party may perfect an appeal. This time period begins to run upon the existence of one condition: the issuance of an order of determination regarding benefit entitlement. Section 39-72-612(1), MCA (1997), contains no reference to the existence of a "dispute," and is thus distinctly different from the statute we consider here. Indeed, this argument typifies the sort of imprecise and scattershot analysis employed by the Court itself. As such, reliance on the reasoning of *Hand* is misplaced.

¶84 Finally, the Court's resolution of this appeal is based in part on a mis-characterization of Mrs. Forgey's arguments. The Court states Mrs. Forgey has argued that she was relieved of her statutory duty to cross-appeal the benefits calculation because Colmore timely appealed the UEF's decision to grant benefits. This theory is created out of thin air to bolster

a sought-for result. Neither Mrs. Forgey nor the UEF have made any argument remotely similar to this. Nor have they even hinted at taking such a position. While I disagree with the Court's decision in this appeal, and while I disagree even more vigorously with the manner in which the Court reaches its decision, I can not overstate my objection to this plain mis-characterization of Mrs. Forgey's arguments. It is simply wrong, and it deserves no place in the Court's Opinion.

**Public Policy as a Guide for Interpretation**

¶85     Not only has this Court misinterpreted § 39-71-520, MCA (1999), it has also ignored the legislative mandate for the interpretation of such statutes and thereby contravened the public policy of this State. The legislature has provided clear guidance to this Court regarding the interpretation of the statute at issue:

> **39-71-105. Declaration of public policy.** For the purposes of interpreting and applying Title 39, chapters 71 and 72, the following is the public policy of this state:
> . . . .
> (3) Montana's workers' compensation and occupational disease insurance systems are intended to be primarily self-administering. Claimants should be able to speedily obtain benefits, and employers should be able to provide coverage at reasonably constant rates. To meet these objectives, *the system must be designed to minimize reliance upon lawyers and the courts to obtain benefits and interpret liabilities.*

Section 39-71-105(3), MCA (1999) (emphasis added). In spite of the legislature's clear direction that our statutory interpretation should be guided by the principle of minimizing reliance upon lawyers and the courts, this Court's interpretation actually invites reliance upon lawyers in the determination of proper benefits, and thereby ensures the involvement of the courts. Clearly, the legislature did not intend that professional legal assistance, with its attendant expense, should be necessary to the resolution of a benefits calculation. Yet,

34

under this Court' Opinion, widows like Mrs. Forgey will either have to become proficient in the fine points of benefit calculation, or employ professional legal assistance in order to determine whether the UEF has rendered an accurate calculation, rather than depending on the UEF to properly calculate benefits or at least make proper re-calculation when necessary.

¶86    Stated another way, the Court's interpretation renders irrevocable a miscalculation accomplished pursuant to a mutual mistake. This result demands that both claimants and uninsured employers secure legal expertise to verify the UEF's initial calculation, or risk living under an erroneous decree. Yet, the statutory scheme does not indicate that such mistakes must be blindly adhered to in perpetuity. As noted above, the plain meaning of § 39-71-520, MCA (1999), discloses nothing that bars a remedial adjustment of benefits in cases where no dispute exists. Moreover, to allow for remedial adjustment is to minimize the need for both claimants and uninsured employers to rely on professional legal assistance in verifying the UEF's initial calculation. This approach would honor Montana's explicitly stated public policy of minimizing reliance on lawyers so as to make the workers' compensation system "primarily self-administering." Section 39-71-105(3), MCA (1999).

¶87    In an apparent effort to pay tribute to the legislature's guidance regarding our statutory construction, the Court states that the UEF's letter to Mrs. Forgey, which apprised her of her benefit calculation, was "easily read by a layperson," was written in "plain English," and was designed to inform her of her benefits "without the necessity of hiring a lawyer." Setting aside the vast differences in education, literacy, reading comprehension,

35

and sophistication[2] that characterize our citizenry, these speculative conclusions are not at all relevant to the legislature's directions to this Court. It is our *interpretation of statutes* that should minimize reliance upon lawyers, and our execution of that task is unrelated to the quality of the UEF's correspondence with claimants. Moreover, it is poor precedent to even suggest that the language chosen by bureaucrats in correspondence can effectively amend clear and unambiguous statutory language chosen by the legislature.

¶88 From the remoteness and safety of our chambers, and with the benefit of hindsight, the Court deftly pinpoints the error of the UEF's calculation. The Court then proceeds to conclude that Mrs. Forgey could have easily done the same. The Special Concurrence goes so far as to assert that even the "numerically challenged" could have readily detected the error. Obviously the concurring Justice's problems with mathematics are completely irrelevant. No doubt, though, her conclusion might well be different if she, as a blue-collar widow, had to detect the error while grieving the death of her blue-collar husband during the process of applying for meager benefits to help feed her two children.

¶89 Additionally, the Special Concurrence asserts that the UEF's letter of determination "set forth precisely how the calculation was performed." In fact, the UEF's explanation was anything but precise. The last step of the calculation explained in the letter contains a two-thirds multiplier which reduced the average weekly wage figure and, in turn, reduced Mrs. Forgey's overall benefit. The letter includes no explanation for this significant reduction. Rather, the calculation is surrounded by references to more than half a dozen

---

[2] Mrs. Forgey did not have a college education, any legal training, or any judicial experience. She graduated high school and worked as a house cleaner and a ranch hand.

workers' compensation statues, leaving the reader to engage in relatively sophisticated legal analysis in order to decipher the UEF's calculation. Thus, in justifying the conclusion that virtually anyone could have easily detected the UEF's calculation error, the Special Concurrence has improperly minimized the nature of the problem Mrs. Forgey faced.

¶90    It is this kind of approach which engenders the sentiment that appellate judges reside in ivory towers, rendering opinions without due regard for the realities facing ordinary citizens. Moreover, the contention that Mrs. Forgey could have deciphered the UEF's calculation in the exercise of "ordinary diligence" rings hollow, given that the Court's initial draft of its Opinion contained glaring errors which demonstrated a fundamental misunderstanding of the calculation.

¶91    Finally, the Special Concurrence bases part of its reasoning on the demonstrably false assertion that Mrs. Forgey "competently and correctly filled out the simple UEF claim form." Upon this assertion, the Special Concurrence posits that Mrs. Forgey could have "just as easily and competently" recognized the UEF's mistake. In fact, however, Mrs. Forgey failed to specify the date Mr. Forgey was hired. As the UEF stated in a brief to the Workers' Compensation Court, it was precisely this failure which resulted in the UEF's miscalculation.

**"Ordinary Diligence"**

¶92    The Court declares that Mrs. Forgey should have discovered the UEF's miscalculation in the exercise of "ordinary diligence." In doing so, the Court refers to the rule that a statute of limitations for actions based on mistake begins to run when the facts are such that the party seeking relief would have discovered the mistake in the exercise of ordinary diligence.

37

This rule is wholly irrelevant because we are not dealing with a statute of limitations for actions based on a mistake. Rather, we are dealing with a statute that explicitly designates the existence of a "dispute" as a prerequisite condition for the running of the time period for appeal. Therefore, the "ordinary diligence" standard has no bearing on the case at bar.

**The "Right" to Rely**

¶93    Before Mr. Forgey's death, Colmore failed to secure workers' compensation insurance, and thereby failed to comply with the legal requirement designed to protect families like the Forgeys in case of an untimely death of the household breadwinner. Now that he has been called to account for this failure, Colmore attempts to avoid the full responsibility that attends such disregard for the law. In doing so, he offers a statutory interpretation that distorts the law at issue and effectively contravenes the stated public policy underlying the Workers' Compensation Act--that wage-loss benefits should "bear a reasonable relationship to actual wages lost as a result of a work-related injury or disease." Section 39-71-105(1), MCA (1999).

¶94    In accommodating Colmore's effort to avoid full responsibility for his disregard of the law, the Court declares that Colmore "had the right to rely on the amount fixed" by the UEF. The Court cites no authority for this bare assertion, because none exists. The Court has simply concocted a "right" to rely on the UEF's miscalculation, without providing a supporting analysis and without reference to a single legal authority. Consequently, this new "right" appears to have been created solely for the purpose of resolving this appeal in favor of the uninsured employer. Obviously, Colmore had no legal right to rely on the miscalculation which denied Mrs. Forgey her proper benefits. He had no more right to rely

38

on that miscalculation than he had a right to employ Mr. Forgey without securing workers' compensation insurance coverage. Simply put, there is no injustice in requiring Colmore to pay the undisputedly correct amount of death benefits. The true injustice lies in denying a widow her statutory death benefits based on a vague notion of reliance which is unsupported by a single reference to legal authority.

¶95     The Court apparently feels no obligation to account in any way for its nonchalant creation of this "right." One wonders: does this "right" emanate from a statute or from a constitution? Or does this "right" have its basis in equitable considerations? If so, why does the Court feel compelled to bestow such privilege upon an uninsured employer in the name of equity, without bothering to mention the equitable concerns inherent in denying the statutorily established measure of death benefits to a widow with two children? Or, may we ask, what principle of equity is served by reducing Mrs. Forgey's death benefits so as to add to Colmore's six-figure tax deduction?

¶96     As the Court has not seen fit to disclose the basis for this "right," it shall apparently remain a mystery to courts and practitioners alike. This Court is remiss in its duty when it resorts to cavalierly creating rights out of whole cloth without reference to one shred of legal precedent. In this case, the Court's impulsive creation of a "right" has allowed the uninsured employer to evade the hand of justice, and thereby reap a windfall at the expense of Mrs. Forgey and her two children.

**Distinguishing Precedent**

¶97     The rule established in *Joseph Eve & Co. v. Allen* (1997), 284 Mont. 511, 945 P.2d 897--a case of first impression, incidentally--involved a procedural background and an issue

wholly dissimilar to the one at bar. In *Joseph Eve & Co.*, the respondent, Allen, moved to dismiss an appeal on the ground that the lower court's judgment was not final. *Joseph Eve & Co.*, 284 Mont. at 512, 945 P.2d at 897. We denied the motion, and two days later Allen filed her motion for leave to file a cross-appeal with this Court. *Joseph Eve & Co.*, 284 Mont. at 512, 945 P.2d at 897. By then the fourteen-day time limit in which to file a cross-appeal had expired. *Joseph Eve & Co.*, 284 Mont. at 512, 945 P.2d at 897-98. In *Joseph Eve & Co.*, there was an issue of law from which to cross-appeal--the finality of the trial court's judgment. There was a "dispute." In the case *sub judice* there was no issue of law from which to cross-appeal, only a mutual mistake of fact, acknowledged by all parties, that was just as capable of ministerial correction as it had been made, ministerially, in the first place. The Court's conclusion to the contrary, Mrs. Forgey had no "duty" to appeal until she had a "dispute" with the UEF's decision.

**Conclusion**

¶98     As noted above, § 39-71-105(1), MCA (1999), provides that the objective of the workers' compensation system is to provide wage loss benefits that bear a reasonable relationship to actual wages lost as a result of a work-related injury. Under the law, Mrs. Forgey was and is entitled to benefits based on an average weekly wage of $443.00. In its decision here, the Court has handed the uninsured employer a windfall, denied a widow the benefits to which she is entitled under the law, and, in misapplying the law, has frustrated the public policy of this State as articulated by the legislature. This is accomplished in part by the use of a newly created "right to rely" on UEF miscalculations which is unsupported

40

by legal precedent, a wholly irrelevant "ordinary diligence" standard, and a plain misrepresentation of Mrs. Forgey's argument on appeal.

¶99    I dissent.

/S/ JAMES C. NELSON


Justice Patricia O. Cotter joins in the concurrence and dissent of Justice James C. Nelson.


/S/ PATRICIA O. COTTER

Justice Morris concurs and dissents.

¶100 I concur with our decision as to Issue One and dissent to our resolution of Issue Two for the following reasons. I would affirm the Workers' Compensation Court as to both issues.

¶101 The Court's opinion today fails to give proper effect to legislative will, culminates in an absurd result, and deprives the statutory scheme of its intended purpose. *State v. Heath*, 2004 MT 126, ¶ 24, 321 Mont. 280, ¶ 24, 90 P.3d 426, ¶ 24. The Court's interpretation of § 39-71-520, MCA (1999), disregards the plain meaning of the term "dispute" and further frustrates the legislative purpose that permits the parties to appeal a contention regarding benefits. *Weber v. Interbel Telephone Co-Op., Inc.*, 2003 MT 320, ¶ 10, 318 Mont. 295, ¶ 10, 80 P.3d 88, ¶ 10 (construing statutory language according to its plain meaning and giving effect to the legislative intent from the text of the statute). The Court's opinion also harvests an absurd result where UEF remains unable to make a remedial calculation to its own benefits computation and thereby denies the beneficiary the full extent of the statutorily enumerated benefits. Finally, the Court's decision defeats the intended purpose of § 39-71-105, MCA (1999), to diminish a claimant's reliance upon lawyers and expeditiously obtain benefits for him or herself. Section 39-71-105(3), MCA (1999).

¶102 I respectfully dissent from the Court's resolution of Issue Two.


/S/ BRIAN MORRIS